**MEESE, EDWARDS, BREEN, CONCIATORI & D'ARMINIO, P.C.**
Karen F. Edler, Esq.
Bar ID: 026451984
50 Tice Boulevard, Suite 380
Woodcliff Lake, New Jersey 07677
Main: (201) 391-3737; ext. 136
Direct: (201)321-7119
Email: kedler@meese-edwards.com
*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| S.K., D.K. and I.K.<br>*Plaintiffs*,<br><br>v.<br><br>TEANECK TOWNSHIP BOARD OF EDUCATION,<br>*Defendant*. | Case No. _______________ |

**COMPLAINT FOR REVIEW OF STATE ADMINISTRATIVE DECISION PURSUANT TO THE INDIVIDUALS WITH DISABILITIES EDUCATION ACT, 20 U.S.C. § 1415(i)(2)**

Plaintiffs S.K., D.K. and I.K. (collectively, the "**Plaintiffs**"), by and through their undersigned counsel, bring this action against Defendant Teaneck Township Board of Education (the "**Defendant**" or "**District**") to appeal and reverse portions of the final administrative decision issued on July 7, 2026, by Administrative Law Judge Julio C. Morejon (the "ALJ") in *S.K. and D.K., on behalf of I.K. v. Teaneck Township Board of Education,* OAL Dkt. No. EDS 10170-22, Agency Dkt. No. 2023-35080 (the "**Decision**"), which is attached to this Complaint as *Exhibit A*, under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 *et seq.*, and in support allege as follows:

## I. INTRODUCTION

1. This action is brought under the IDEA, 20 U.S.C. § 1415(i)(2), to appeal portions of the Decision, which erred: (1) in concluding that the District did not fail to provide I.K. with a free appropriate public education ("FAPE") for the 2023−2024 and 2024−2025 school years (Decision, p. 50) because "[u]nder these circumstances, the District has no obligation to issue an IEP" (*Id.*, p. 49); (2) in failing to rule on Plaintiffs' compensatory education claims despite the ALJ's determination that "I.K. did not make meaningful progress in light of his circumstances (he regressed) and therefore [the District] denied I.K. a free and appropriate public education" (*Id.*, p. 47) because "[the] District's Banyan IEPs did not satisfy the District's IEP-stated justification for placing I.K. at Banyan: "in order to have his severe communication impairment and social skills needs met." (Ex. J at ; [*sic*] 1Tr. 116:6−12.)." (Decision, p. 46).

2. Plaintiffs request that this court: (1) reverse the ALJ's erroneous legal conclusion that "District did not fail to provide I.K. with a FAPE for the 2023−2024 and 2024−2025 school years"; (2) order Defendants to reimburse Plaintiffs' for their tuition and transportation costs for the 2023 - 2024 and 2024 - 2025 school years; (3) order Defendant to pay compensatory education to Plaintiffs in light of the ALJ's failure to rule on Plaintiffs compensatory education claim referenced in the Decision; and (4) grant Plaintiffs' request as the prevailing party for reimbursement of Plaintiffs' legal fees incurred in the underlying due process action and this action.

## II. JURISDICTION AND VENUE

1. This Court has jurisdiction over this action pursuant to 20 U.S.C. § 1415(i)(2)(A) and 28 U.S.C. § 1331, as the action arises under the laws of the United States.

2. Plaintiffs have exhausted their administrative remedies under 20 U.S.C. § 1415 of the Individuals with Disabilities Education Act ("IDEA").

3. Venue is proper in this district under 28 U.S.C. § 1391.

4. This appeal is timely filed within 90 days of the ALJ's decision, pursuant to IDEA, 20 U.S.C. § 1415(i)(2)(B).

## III. PARTIES

1. Plaintiff I.K. was a student with a disability who qualified for special education and related services under the classification of communication impairment in Defendant's schools from 2013 through his graduation from Aaron School in June 2026. I.K. lives in Teaneck, New Jersey with his parents S.K. and D.K.

2. Plaintiffs S.K. and D.K. are I.K.'s parents who reside in Teaneck, New Jersey.

3. Defendant Teaneck Township Board of Education is a New Jersey public school board of education and Local Educational Agency ("LEA") as defined by 20 U.S.C. § 1401(a), which is the recipient of federal funds for the provision of special education programs and services pursuant to 20 U.S.C. §1400, *et seq*.

## IV. PROCEDURAL HISTORY

1. On October 25, 2022, Plaintiffs filed a due process petition alleging that the Defendant failed to provide I.K. with an IEP that ensured FAPE. Plaintiffs sought reimbursement for I.K.'s unilateral placement at Aaron School, transportation, related expenses, compensatory education, attorneys' fees, and other relief.

2. On March 29, 2024, *with Plaintiffs' consent*, the Defendant filed its Answer to Due Process Petition.

3. On April 10, 2024, *with Defendant's consent*, Plaintiffs simultaneously filed an Amended Due Process Petition seeking reimbursement for the 2023–2024 and 2024–2025 school years and sent an Unilateral Placement Notice to Defendant for the 2024 – 2025 school year.

4. On June 26, 2024, the District filed its Answer to Amended Petition.

5. The ALJ conducted hearings on April 19, 2024, May 15, 2024, May 17, 2024, May 24, 2024, June 17, 2024, and July 1, 2024.

6. Defendants presented testimony from "Vanessa Lospalluto, M.S.Ed., LDT-C, learning disability teacher consultant; Dr. Kristine Thielman, school psychologist, preschool and elementary school child study team coordinator; Leana Barbosa, S.L.P., speech/language pathologist; and Janet Seabold, principal, Banyan High School." (Decision, p. 16).

7. Plaintiffs presented testimony from Dr. Jeanne Tighe, SLPD, CCC-SLP, SL/DI, BSC-CL; Tieasha Crawford, M.S.Ed., Educational Supervisor of the Upper School of Aaron School; and Plaintiffs S.K. and D.K.

8. The parties submitted post-hearing submissions on August 19, 2024.

9. On April 2, 2026, the ALJ requested supplemental submissions on whether the District offered an IEP for the 2022–2023 school year. The parties submitted supplemental briefs, and the ALJ closed the record on April 13, 2026.

10. On July 7, 2026, the ALJ issued the Decision.

## V. RELEVANT FACTS - Student's Disability and Needs

1. Defendant determined I.K. as eligible for special education and related services under the legal eligibility category of Communication Impaired from June 2013 through J-20,

which lists I.K. as eligible for special education and related services under the legal classification of Communication Impairment[1].

2. Defendant's IEPs from 2013 through winter 2019, placed I.K. in Defendant's district for grades from kindergarten through mid-year fifth grade at Benjamin Franklin Middle School, a District school.

3. I.K. is diagnosed with Developmental Language Disorder (DLD). DLD involves language difficulties which "are not explained by other conditions, such as hearing loss or autism, or by extenuating circumstances, such as lack of exposure to language. DLD can affect a child's speaking, listening, reading, and writing. (P-1; P-29.)." (Decision, p. 5).

4. Dr. Jeanne Tighe's 2018 evaluation found severe deficits in language comprehension and recommended: small-group academic instruction; intensive direct language instruction; specialized reading-comprehension instruction; explicit writing instruction; social communication intervention; and a specialized out-of-district placement with greater language, literacy, and social supports. (Decision, p. 5-6).

5. Dr. Tighe did not recommend Wilson Reading because I.K. was already proficient in decoding, reading fluency, and spelling. (Decision, p. 6, 34-35).

## VI. RELEVANT FACTS – "Banyan IEPs"[2]

### 2018 IEP Amendment Placing I.K. at Banyan

1. On January 24, 2019, Defendant formally issued a written amendment to I.K.'s 2018 IEP Amendment (J-7) to place I.K. at Banyan School and set forth its rationale for the placement:

---

[1] In 2020 the New Jersey Administrative Code was amended to change "Communication Impaired to "Communication Impairment". N.J.A.C. 6a:14-3.5(c)(4).

[2] The "Banyan IEPs" means the 2018 IEP Amendment (J-7), the 2019 IEP (J-8), the 2020 IEP (J-11), the 2021 IEP (J-18) and the draft 2022 IEP/J-20. Decision, p. 8, 45-46).

> Due to several peer conflicts, resulting in negative emotional responses from I., many supportive interventions were put into place. I. continued to experience peer conflicts in school and on the bus and in turn began refusing to attend school. ***I. was then placed at Banyan School in order to have his severe communication impairment and social skills needs met***. The district's program was considered and rejected. The district is in agreement with placement at Banyan School and will conduct a 30-day review to assess I.'s progress in the program. [emphasis supplied]

J-8, p. 1-2; Decision, p. 5-6.

2. Upon I.K.'s entry to Banyan in January 2019, Banyan administered the Woodcock-Johnson Reading Mastery Tests, Third Edition. Although I.K. was in the middle of his fifth-grade year, he achieved the equivalent of a sixth grade, first-month score in basic reading skills and an eighth-grade, sixth-month grade equivalency in word attack skills, evidencing personal strength in basic reading. (Decision, p. 7; J-23).

3. "In early 2019, Banyan administered the Word Identification Spelling 7 OAL DKT NO. EDS 10170-22 Test ("WIST") to I.K., wherein he scored in the average range on the reading and spelling tests. (J-20.)." (Decision, p. 7-8).

4. Despite I.K.'s grade-level or above-grade-level basic reading skills, the District placed I.K. in Banyan's Focus Intensive Reading Strategies & Techniques ("FIRST") program—a Wilson-intensive course spanning eighty minutes per day—and continued this placement through eighth grade. (Decision, p. 8).

**2019 IEP**

5. On March 15, 2019, the District held a thirty-day review meeting and issued the 2019 IEP (J-8), placing I.K. in Banyan's FIRST program. (Decision, p. 8).

6. Defendant's 2019 IEP did not include any IEP social skills services or instruction.

**2020 IEP**

7. In November 2019, Banyan issued its first progress report was issued for I.K., who was in sixth grade. I.K. did not achieve a single goal or objective in Speech, Reading, Language Arts, or Social Studies. (Decision, p. 8; J-9).

8. On March 3, 2020, the District's IEP Team conducted an annual review and issued the 2020 IEP (J-11). The District's 2020 IEP continued I.K.'s daily Wilson FIRST class for eighty minutes, despite the District's own Developmental Reading Assessment ("DRA") confirming that I.K. was at grade level in reading accuracy and reading fluency—the areas Wilson is designed to remediate. The 2020 IEP did not provide I.K. with any social skills class or instruction, and maintained a majority of the same goals and objectives as the prior IEP.

**2021 IEP & Reevaluation**

9. In May 2021, during I.K.'s seventh-grade year, the District conducted I.K.'s triennial reevaluation. The District's CASL-2 testing reflected that I.K.'s General Language Ability Index of sixty-four (64) placed him in the first percentile—a ten-point reduction from the District's 2018 CASL-2 testing. I.K.'s sentence expression standard score decreased by eleven points, and his non-literal language standard score decreased by eight points from the District's 2018 testing.

10. The District's May 2021 Woodcock-Johnson Tests of Achievement (WJ-IV) reflected the following decreases from the District's 2018 testing: academic skills score decreased eleven points; academic fluency score decreased twelve points; academic applications score decreased eight points; brief achievement score decreased seven points; and broad achievement score decreased ten points.

11. The District's 2021 triennial reevaluation showed continued and significant language weaknesses, including a General Language Ability Index in the first percentile, reduced language scores from prior testing, and academic weaknesses tied to language comprehension.

12. The District's 2021 IEP acknowledged that I.K.'s communication impairment affected listening, speaking, reading, writing, and socialization.

13. I.K.'s reading comprehension was at a grade 2.9 level during his seventh-grade year, evidencing the ongoing impact of his DLD.

14. On June 4, 2021, the District issued the 2021 IEP (J-18), continuing I.K.'s placement at Banyan for his eighth-grade 2021–2022 school year. The 2021 IEP continued the same programming as

the 2020 IEP, despite a lack of progress and I.K.'s declining reevaluation results. The 2021 IEP did not provide I.K. with the related service of social skills, despite acknowledging that his "communication impairment is impacting listening, speaking, reading, writing and socialization." The 2021 IEP maintained a majority of the same goals and objectives as the 2020 IEP, despite I.K.'s failure to master those goals.

15. The 2021 IEP was the last agreed-upon IEP between the parties.

16. The May 19, 2022 IEP meeting was the last IEP meeting held by the District.

17. During the 2021–2022 school year (eighth grade), Banyan's DRA scores placed I.K.'s basic reading skills at or above grade level. The 2021 IEP nonetheless continued I.K.'s placement in an eighty-minute double period of Wilson FIRST. I.K.'s reading gap of at least one to two grade levels remained unchanged after more than three years at Banyan. The Banyan placement did not.

**2022 Draft IEP/J-20[3]**

18. On May 19, 2022, the District convened an annual review IEP meeting for I.K.'s transition to high school.

[3] The 2022 Draft IEP is not on any Exhibit List submitted to the court. It was a draft for the May 19, 2022, meeting, not a finalized IEP. As part of the discovery during the due process action Defendant produced J-20 to Petitioners for the first time (3Tr. 153:4–18). J-20 contains information in the "special alert" section on the cover page that references Plaintiffs' unilateral placement of I.K. and the underlying due process petition which was filed on October 25, 2022. It also references the search for a new placement, all of which occurred following the May 19, 2022 IEP meeting. Petitioners argued in the alternative: (1) that Defendant did not provide I.K. with FAPE because it did not provide Petitioners with a finalized IEP leaving Petitioners' without an IEP or IEP placement for I.K. for the 2022 - 2023 school year or any school year thereafter; or (2) that if the court determined that the District issued an IEP for the 2022 – 2023 school year that IEP was not designed to provide I.K. with meaningful benefit so it was not designed to provide I.K. with a FAPE. The draft 2022 IEP provided to Plaintiffs before the May 19, 2022 IEP meeting was not listed as a trial exhibit and was never introduced or admitted into evidence. It is distinct from J-20, the document admitted as a joint exhibit. The Decision rejected Petitioners' no-offer position, concluded that the May draft contained the District's offered program, and concluded that the District finalized it as J-20. Then the ALJ concluded that the 2022-2023 IEP did not provide FAPE to I.K. and Petitioners agree that the 2022 Draft IEP/J-20 did not deliver FAPE to I.K., while preserving their argument that Defendant failed to comply with its obligation to have an IEP in place prior to the school year (20 U.S.C. § 1414(d)(2)(A); 34 C.F.R. § 300.323(a); and N.J.A.C. 6A:14-3.7(a)(1)) and its obligation to provide the Plaintiffs written notice no later than 15 calendar days after its determination and at least 15 calendar days before the IEPs implementation (N.J.A.C. 6A:14-2.3(f), (h)(1)–(2)). These violations resulted in a denial to Plaintiffs of meaningful participation in the IEP programming and placement process and denied I.K. FAPE.

19. The District provided Plaintiffs with a draft IEP the day before the May 19, 2022, meeting.[4]

20. Plaintiffs told Defendant at the May 19, 2022 IEP meeting that Banyan's repeated goals and educational strategies were not helping I.K., that its social environment was causing him substantial distress, and that they wanted different programming and placement. Plaintiff D.K. also testified that her review of I.K.'s evaluations showed no appreciable progress and a decline in some areas. 3Tr. 148:17–151:2, 153:19–155:1.

21. The Decision stated that:

> At the May 2022 IEP meeting, petitioners shared that I.K. was on the verge of school refusal. I.K. repeatedly expressed wanting a new placement for high school. At the May 2022 IEP meeting, petitioners requested that the District seek an alternative placement for high school, and the District agreed to explore a new out-of-district placement for I.K. as he entered high school. In addition, the District agreed to send records to a number of out-of-district day-placement schools, including The Craig School, 11 OAL DKT NO. EDS 10170-22 Community School, and Winston Prep (J-21) and asked if petitioners had any other suggestions.

Decision, p. 11-12.

22. Winston Preparatory High School and The Craig School rejected I.K. or advised that they could not meet his needs. (Decision, p. 12; 4Tr. 17:21–19:14; 4Tr. 21:16–22:6; 3Tr. 159:9–20**)**.

23. D.K. testified that the District scheduled the Community School and Banyan intakes. She said S.K. took I.K. to the Community intake. (4Tr. 20:5–21:4), and S.K. and I.K. attended the Banyan intake (4Tr. 21:5–7).

---

[4] The draft IEP provided to Plaintiffs before the May 19, 2022 IEP meeting was not listed as a trial exhibit and was never introduced or admitted into evidence. See fn. 3 above.

24. D.K. testified that S.K. took I.K. to Honor Ridge intake. (4Tr. 22:14–23:10; 3Tr. 159:21–25). She said Honor Ridge was added later to the District's search (3Tr. 159:5–8) and described it as a school "they had asked us to go and see". (3Tr. 161:5–7; P-8).

25. D.K. testified that the parents repeatedly inquired about a high-school placement during the summer of 2022 and received no notice of acceptance or confirmed available placement at those schools. *Id*.

26. The ALJ found that I.K. was not accepted into any of the proposed placements identified in the decision. (Decision, p. 12; P-4; P-6).

27. Janet Seabold, Banyan High School's principal, testified that she had not reviewed I.K.'s records and did not know what high-school program, if any, Banyan had offered him. Neither her May 17 testimony nor her July 1 rebuttal testimony identified an acceptance of I.K. at Banyan High School.

28. The ALJ found that Ms. Seabold's testimony did not address I.K.'s IEP or placement at Banyan. Ms. Seabold described the general practice during her tenure for students moving from Banyan's lower school to its high school but said she did not know what process preceded her July 2022 start date.

## VII. RELEVANT FACTS – UNILATERAL PLACEMENT AT AARON SCHOOL

1. In response to the District's case manager's request for other potential placements, Plaintiffs asked the District to consider Aaron School as a potential placement and asked the District to send I.K.'s records to Aaron. D.K. testified that the District did not provide those records and that the District's case manager did not attend Aaron's intake despite Plaintiffs' invitation. (TR citation).

2. On July 25, 2022, Aaron School accepted I.K. for the 2022–2023 school year.

3. On July 25, 2022, Plaintiffs, through counsel, asked the District to place I.K. at Aaron School.

4. D.K. testified that, when Aaron accepted I.K., the Plaintiffs did not receive any correspondence from the District advising of an acceptance at Banyan, Community, or Honor Ridge and had no acceptance letter from any school other than Aaron. When the ALJ asked about Community, D.K. distinguished its invitation to fall 2022 shadow days from an acceptance letter.

5. D.K. testified that Aaron was the only guaranteed placement she knew of or had that summer. When the ALJ asked whether Aaron was the only out-of-district placement available to the family in August 2022, she answered yes. She had no paperwork admitting I.K. to Banyan High School and testified that the family had heard nothing about its request for a District IEP placement as school approached. On cross-examination, she said she assumed Banyan might have space but did not know that for a fact.

**Unilateral Placement Notice 2022 – 2023**

6. On August 10, 2022, Plaintiffs issued a unilateral placement notice advising the District that they intended to place I.K. at Aaron School for the 2022–2023 school year and seek reimbursement.

7. The District did not: respond to the unilateral placement notice; hold an IEP meeting; hold a resolution meeting; or offer an appropriate alternative placement before the start of school.

8. Plaintiffs signed Aaron School's enrollment contract on August 26, 2022, shortly before the start of the school year.

9. Plaintiffs commenced the due process petition seeking reimbursement on October 25, 2022, less than two months after I.K. started Aaron School.

10. I.K. attended Aaron School during the 2022–2023 school year and made meaningful progress at Aaron.

11. None of the District's employee witnesses—Vanessa Lospalluto, Dr. Kristine Thielman, or Leanna Barbosa—testified that Plaintiffs withdrew I.K. from the District.

12. The District provided J-20 during discovery in the case. J-20's cover-page "Special Alerts" section says that it "is currently in due process" and that I.K. "has been parentally placed at The Aaron School."

13. J-20 was created by the District. J-20 evidences that I.K. was unilaterally placed at Aaron by his parents who filed due process, *not that I.K. was withdrawn from the District*.

14. Defendant did not introduce any evidence or present any testimony that I.K. was withdrawn from the District during any of the school years in question.

**Unilateral Placement Notice 2023 - 2024**

15. On August 4, 2023, Plaintiffs, through counsel, issued a Unilateral Placement Notice pursuant to 20 U.S.C. 1412(a) (10) (C)(iii)(I) (bb) & N.J.A.C. 6A:14-2.10 to Defendant through its counsel. The notice advised that Plaintiffs intended to enroll I.K. at Aaron School for the 2023–2024 school year and seek reimbursement from the District.

16. The District did not convene an IEP meeting or propose an IEP for the 2023–2024 school year despite Plaintiffs' unilateral placement notice to Defendant, and the due process petition pending in the Office of Administrative Law ("OAL").

**Unilateral Placement Notice 2024 - 2025**

17. On April 10, 2024, *with Defendant's consent*, Plaintiffs simultaneously filed an Amended Due Process Petition seeking reimbursement for the 2023–2024 and 2024–2025 school years and sent an Unilateral Placement Notice to Defendant for the 2024 – 2025 school year.

18. The District consented to Plaintiffs' amendment of the due process petition to include the unilateral placement notice and Plaintiffs' claims for reimbursement of all costs of placement of I.K. at Aaron School for both I.K.'s 2023 – 2024 (10th grade) and 2024–2025 (11th grade) school years.

19. The District did not convene an IEP meeting or propose an IEP for the 2024 – 2025 school year despite Defendant's consent to the inclusion of the 2024 – 2025 school year, the pending due process action which was about to start trial.

20. Aaron School is a private K–12 special education school that serves students with learning disabilities, DLD, language-based learning needs, and social challenges.

21. Ms. Crawford detailed Aaron's integrated speech-language instruction, applied academic classes, social-skills instruction, a group counseling class and weekly individual counseling, executive-function instruction, individualized supports, and case-study meetings addressing I.K.'s needs.

22. Plaintiffs' witnesses described I.K.'s academic and social progress at Aaron, while acknowledging his continuing language and social challenges.

23. The ALJ concluded that I.K.'s placement at Aaron was appropriate and reasonably calculated to enable him to receive educational benefits in light of his circumstances.

24. The ALJ then correctly concluded that Plaintiffs "did not engage in any unreasonable conduct that would warrant a reduction in the reimbursement of the costs of tuition for the Aaron School and reimbursement for transportation." (Decision, p. 55).

25. Despite these favorable factual findings, the ALJ inexplicably and erroneously limited Plaintiffs' tuition and transportation reimbursement to the 2022–2023 school year.

26. Plaintiff's due process petition seeking reimbursement for their unilateral placement of I.K. at Aaron School was pending for more than the entirety of I.K.'s high school education.

27. Plaintiffs issued the appropriate Unilateral Placement Notices.

28. Defendant was well aware of the pending litigation and even consented to add Petitioners' claims for 10th and 11th grade to the litigation.

29. Defendant chose not to respond to the Unilateral Placement Notices, not to hold an IEP meeting and not to propose an IEP for those years.

## VIII. RELEVANT FACTS – COMPENSATORY EDUCATION

1. Plaintiff's due process petition requested compensatory education for the three and a half years at Banyan that Defendant failed to provide FAPE to I.K. (Decision, p. 2).

2. The Decision did not award compensatory education even though it found that the District's Banyan IEPs denied I.K. FAPE and failed to produce meaningful progress in light of I.K.'s circumstances.

3. The ALJ's failure to award compensatory education, or an equivalent post-graduation equitable remedy, was error.

## IX. GOVERNING LEGAL STANDARDS

1. The standard of review of this appeal of portions of the Decision pursuant to IDEA, 20 U.S.C. § 1415(i)(2) is a modified *de novo* review. The court makes a determination on the administrative record while giving the ALJ's factual findings due weight. Those findings are treated as *prima facie* correct; if the court departs from them, it must explain why. Legal

conclusions receive no comparable factual deference. S.H. v. State-Operated School District of Newark, 336 F.3d 260, 270–71 (3d Cir. 2003); Le Pape v. Lower Merion School District, 103 F.4th 966, 976 (3d Cir. 2024).

2. The IDEA requires a school district to provide a FAPE to each eligible child with a disability through an IEP reasonably calculated to enable the child to make progress appropriate in light of the child's circumstances. See Endrew F. v. Douglas County School District RE-1, 137 S.Ct. 988, 1001 (2017).

3. The IEP is the central mechanism by which the IDEA ensures that a child with a disability receives specialized instruction and related services tailored to the child's unique needs.

4. Under 20 U.S.C. § 1414(d), a school district must have an IEP in effect for each eligible child with a disability at the beginning of each school year.

5. Under New Jersey law, the school district bears both the burden of proof and the burden of production in due process proceedings concerning identification, evaluation, classification, educational placement, FAPE, or discipline. N.J.S.A. 18A:46-1.1.

6. Parents who disagree with an inappropriate public program may unilaterally place their child in an appropriate private placement and seek reimbursement when the district failed to provide FAPE, the private placement is appropriate, and equitable considerations support reimbursement. See School Committee of Town of Burlington, Massachusetts v. Department of Education of Massachusetts, 471 U.S. 359 (1985); Florence County School District Four v. Carter, 510 U.S. 7 (1993).

7. Parents' unilateral placement does not waive the child's IDEA rights or extinguish the district's obligation to offer FAPE for school years that remain at issue,

particularly where the parents continue to challenge the district's failure to provide FAPE and seek reimbursement and placement relief.

8. The IDEA's private-school provisions do not allow a district to avoid its FAPE obligations simply because parents had to make a unilateral placement after the district failed to offer an appropriate program.

9. When parents provide unilateral-placement notices and continue to prosecute due process claims seeking public funding for the private placement, the district has actual notice that the parents dispute the district's program, seek a publicly funded appropriate placement, and have not waived their child's right to FAPE.

10. A contrary rule would penalize parents for mitigating harm to the child and would allow a district's failure to offer FAPE in one year to excuse its failure to develop and offer an appropriate IEP in later years.

11. Compensatory education provides an equitable remedy for educational services and benefits that a student should have received but did not receive because of a district's denial of FAPE.

**COUNT I**
**APPEAL OF ERRONEOUS DENIAL OF REIMBURSEMENT FOR THE 2023–2024 SCHOOL YEAR**

1. Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein.

2. The ALJ correctly found that the District denied I.K. FAPE for the 2022–2023 school year, that Aaron appropriately served I.K., and that the equities favored reimbursement.

3. The ALJ erred when he failed to apply the same core facts that supported reimbursement for the 2022–2023 school year to the 2023–2024 school year.

4. The ALJ erred when he concluded that "District did not fail to provide I.K. with a FAPE for the 2023−2024 and 2024−2025 school years." (Complaint, p. 50).

5. The ALJ erred by treating the Plaintiff's unilateral placement with appropriate notice the same *as if* the parent withdrew the child and placed him parentally in a private school and then sought reimbursement from the district. Plaintiffs issued Unilateral Placement Notices and pursued reimbursement in the pending due process proceeding; their claims therefore required analysis under the IDEA's reimbursement provisions, not disposition under the equitable-services rule for parentally placed private-school students. (20 U.S.C. § 1412(a)(10)(C); 34 C.F.R. § 300.148(b)–(c); Decision, p. 3, 16, 49–50).

6. The ALJ erred in treating I.K. as though Plaintiffs had withdrawn him from Defendant's school when the administrative record does not contain any exhibits or testimony to support that either Plaintiffs or Defendant withdrew I.K. from Defendant's district. Indeed J-20 is evidence of I.K.'s continued enrollment in the district.

7. The District did not convene an IEP meeting, propose an IEP, offer an appropriate placement conduct, or propose updated evaluations as needed, or otherwise discharge its obligation to offer FAPE for the 2023–2024 school year despite Plaintiffs' Unilateral Placement Notice and pending due process claim.

8. Plaintiffs' August 4, 2023, Unilateral Placement Notice was in compliance with 20 U.S.C. 1412(a) (10) (C)(iii)(I) (bb) & N.J.A.C. 6A:14-2.10 and properly advised Defendant of Plaintiffs' intent to continue I.K.'s placement at Aaron School and seek reimbursement from Defendant.

9. The District consented to the amendment of the due process petition to include the 2023–2024 school year and thereby acknowledged that reimbursement for that school year was an issue in the administrative proceeding.

10. Plaintiffs' ongoing due process petition also provided Defendant with detailed notice of Plaintiffs' request for reimbursement from the District for the cost of I.K.'s placement at Aaron School from Defendant because Defendant failed to provide I.K. with FAPE.

11. The ALJ erred when he required Plaintiffs to request re-enrollment in the District as a condition precedent to the District's obligation to offer FAPE for 2023–2024.

12. Plaintiffs did not have to remove I.K. from an appropriate unilateral placement, request re-enrollment in an inappropriate or nonexistent District program, or abandon their reimbursement claim to preserve I.K.'s right to FAPE.

13. The ALJ misplaced reliance on the absence of a request for re-enrollment or evaluation because Plaintiffs had already invoked the IDEA process, actively litigated the District's failure to provide FAPE, provided unilateral-placement notice, and sought reimbursement and appropriate placement relief.

14. The District's failure to offer any IEP for 2023–2024 denied I.K. FAPE.

15. Aaron continued to appropriately serve I.K. during the 2023–2024 school year and enabled I.K. to receive meaningful educational benefit in light of his circumstances.

16. Equitable considerations support reimbursement because Plaintiffs cooperated with the District, provided notice, made I.K. available, pursued appropriate placement options, and acted reasonably to secure an appropriate education.

17. Plaintiffs are entitled to reimbursement for Aaron School tuition, transportation, and related expenses for the 2023–2024 school year.

**COUNT II**
**APPEAL OF ERRONEOUS DENIAL OF REIMBURSEMENT FOR THE 2024–2025 SCHOOL YEAR**

1. Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein.

2. The ALJ correctly found that the District denied I.K. FAPE for the 2022–2023 school year, that Aaron appropriately served I.K., and that the equities favored reimbursement.

3. The ALJ erred when he failed to apply the same core facts that supported reimbursement for the 2022–2023 school year to the 2024–2025 school year.

4. The ALJ erred when he concluded that "District did not fail to provide I.K. with a FAPE for the 2023−2024 and 2024−2025 school years." (Complaint, p. 50).

5. The ALJ erred by treating the Plaintiff's unilateral placement with appropriate notice the same *as if* the parent withdrew the child and placed him parentally in a private school and then sought reimbursement from the district. Plaintiffs issued Unilateral Placement Notices and pursued reimbursement in the pending due process proceeding; their claims therefore required analysis under the IDEA's reimbursement provisions, not disposition under the equitable-services rule for parentally placed private-school students. 20 U.S.C. § 1412(a)(10)(C); 34 C.F.R. § 300.148(b)–(c); Decision, p. 3, 16, 49–50.

6. The ALJ erred in treating I.K. as though Plaintiffs had withdrawn him from Defendant's school when the administrative record does not contain any exhibits or testimony to support that either Plaintiffs or Defendant withdrew I.K. from Defendant's district. Indeed J-20 is evidence of I.K.'s continued enrollment in the district.

7. Plaintiffs' April 10, 2024 Unilateral Placement Notice advised the District that Plaintiffs intended to continue I.K.'s placement at Aaron for the 2024–2025 school year and sought reimbursement.

8. The District consented to the amendment of the due process petition to include the 2024–2025 school year and thereby acknowledged that reimbursement for that school year was an issue in the administrative proceeding.

9. The District still did not convene an IEP meeting, propose an annual IEP, offer an appropriate program, conduct, or propose updated evaluations as needed, or otherwise discharge its obligation to offer FAPE for the 2024–2025 school year.

10. The ALJ erred as a matter of law when he concluded that the District had no obligation to offer an IEP for 2024–2025 absent a request for re-enrollment or evaluation.

11. Plaintiffs' unilateral placement of I.K. at Aaron did not waive I.K.'s IDEA rights and did not relieve the District of its obligation to offer FAPE.

12. Plaintiffs' pending due process claim, amended petition, and unilateral-placement notice gave the District actual notice that Plaintiffs continued to seek public funding and appropriate educational programming for I.K.

13. Aaron continued to appropriately serve I.K. for the 2024–2025 school year.

14. Equitable considerations support reimbursement for the 2024–2025 school year.

15. Plaintiffs are entitled to reimbursement for Aaron School tuition, transportation, and related expenses for the 2024–2025 school year.

**COUNT III**
**DEFENDANT HAD AN OBLIGATION TO DEVELOP IEPS**

1. Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein.

2. The ALJ erred when he ruled that Defendant "has no obligation to issue an IEP" for I.K. because "I.K. was enrolled in a unilateral placement of petitioners' own selection, had commenced this litigation, and never made any request to return to the District, scheduled a meeting, or requested an IEP from the District." (Decision, p. 49).

3. The IDEA required the District to develop, review, and revise an IEP for I.K. and to have an IEP in effect at the beginning of each school year while I.K. remained eligible.

4. I.K. remained eligible for special education and related services.

5. Defndant knew that: I.K. remained a resident student with IDEA eligibility; Plaintiffs disputed the District's proposed program; Plaintiffs placed I.K. at Aaron because of the District's denial of FAPE; and Plaintiffs sought reimbursement and appropriate placement relief.

6. Defendant did not develop or offer annual IEPs for the 2023–2024 or 2024–2025 school years.

7. Defendant's failure to develop and offer annual IEPs impeded I.K.'s right to FAPE, significantly impeded Plaintiffs' participation rights, deprived I.K. of educational benefits, and forced Plaintiffs to continue funding Aaron School and related transportation.

8. Plaintiffs are entitled to declaratory, equitable, and reimbursement relief for the District's failure to develop and offer annual IEPs for the school years at issue before I.K.'s June 2026 graduation.

**COUNT IV**
**COMPENSATORY EDUCATION FOR DENIAL OF FAPE UNDER THE BANYAN IEPS**

1. Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein.

2. Plaintiffs sought compensatory education in the administrative proceeding based on the District's denial of FAPE.

3. The Decision found that the District's Banyan IEPs did not address I.K.'s severe DLD or social needs, that the District's proposed program failed to meet the standards required by law, and that I.K. did not make meaningful progress in light of his circumstances while in the District's proposed programming.

4. The Decision further found that the District denied I.K. FAPE and that the District failed to prove by a preponderance of the evidence that it provided I.K. with FAPE for the 2022–2023 school year.

5. Despite those findings, the Decision did not award compensatory education or otherwise remedy the educational loss caused by the District's failure to provide FAPE under the Banyan IEPs.

6. Compensatory education can make I.K. whole for educational services and benefits that he should have received but did not receive because of the District's denial of FAPE.

7. Plaintiffs are entitled to compensatory education, or an equivalent post-graduation equitable remedy, in an amount and form sufficient to remedy the educational deprivation caused by the District's failure to provide FAPE under the Banyan IEPs and any other school years for which the Court finds a denial of FAPE.

## COUNT V
## EQUITABLE REIMBURSEMENT, FEES, AND POST-GRADUATION EQUITABLE RELIEF

1. Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein.

2. The IDEA authorizes courts to grant appropriate relief. 20 U.S.C. §1415(i)(2)(C)(iii).

3. Plaintiffs acted reasonably and equitably throughout the placement process.

4. Plaintiffs raised concerns at the May 2022 IEP meeting, cooperated with the District's proposed placement search, proposed Aaron, requested District participation, provided unilateral-placement notices, and pursued administrative relief.

5. The District did not offer an appropriate placement for 2022–2023 and did not develop or offer annual IEPs for 2023–2024 and 2024–2025, despite Plaintiffs' continued notices and pursuit of reimbursement.

6. Plaintiffs are entitled to reimbursement for tuition, transportation, and related expenses for the 2023–2024 and 2024–2025 school years.

7. Plaintiffs do not seek prospective relief requiring a future IEP meeting or prospective IEP because I.K. graduated from Aaron School in June 2026. Plaintiffs instead seek reimbursement, compensatory education or equivalent post-graduation equitable relief, prevailing-party attorneys' fees and costs, and any other post-graduation equitable relief the Court deems appropriate to remedy the denial of FAPE for the school years at issue.

**COUNT VI**

**REIMBURSEMENT OF ATTORNEYS' FEES AND COSTS – 20 U.S.C. §1415(I)(3)(B))**

1. Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein.

2. Plaintiffs are prevailing parties within the meaning of 20 U.S.C. § 1415(i)(3)(B) because the Decision awarded them material, judicially enforceable relief on the merits, including findings that the District denied I.K. FAPE for the 2022–2023 school year, that Aaron appropriately served I.K., that equitable considerations favored reimbursement, and that the District must reimburse Plaintiffs for Aaron School tuition and transportation for the 2022–2023 school year.

3. . Pursuant to 20 U.S.C. §1415(i)(3)(B), Plaintiffs are entitled to make application for reimbursement of reasonable counsel fees and costs incurred in connection with this action and the administrative proceedings below if they are successful in their appeal.

4. Plaintiffs will also be prevailing parties on this appeal to the extent the Court reverses the adverse portions of the Decision and awards additional relief for the 2023–2024 and/or 2024–2025 school years, compensatory education, or other equitable relief.

5. Plaintiffs are entitled to reasonable attorneys' fees and recoverable costs incurred in the administrative proceedings and in this civil action under 20 U.S.C. § 1415(i)(3)(B) and

applicable law, including taxable witness fees to the extent permitted by 28 U.S.C. §§ 1821 and 1920 or other applicable authority. Plaintiffs do not seek expert-witness fees beyond those recoverable under applicable law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court:

1. Affirm the portions of the Decision finding that the District's Banyan IEPs all denied I.K. FAPE, including the draft IEP for the 2022–2023 school year, that Aaron appropriately served I.K., and that equitable considerations favored reimbursement.

2. Reverse the portions of the Decision denying relief for the 2023–2024 and 2024–2025 school years.

3. Declare that the District denied I.K. FAPE for the 2023–2024 and 2024–2025 school years.

4. Declare that Aaron School appropriately served I.K. for the 2023–2024 and 2024–2025 school years.

5. Declare that equitable considerations support reimbursement for the 2023–2024 and 2024–2025 school years.

6. Order Defendant to reimburse the Plaintiffs for Aaron School tuition, transportation, and related expenses for the 2023–2024 and 2024–2025 school years.

7. Award compensatory education, or an equivalent post-graduation equitable remedy, sufficient to remedy the educational deprivation caused by the District's failure to provide FAPE under the Banyan IEPs and any other school years for which the Court finds a denial of FAPE without requiring a future IEP meeting or prospective IEP because I.K. graduated from Aaron School in June 2026.

8. Declare Plaintiffs to be prevailing parties under the IDEA and award Plaintiffs reasonable attorneys' fees and recoverable costs incurred in the administrative proceedings and in this civil action under 20 U.S.C. § 1415(i)(3)(B) and applicable law, including taxable witness fees to the extent permitted by 28 U.S.C. §§ 1821 and 1920 or other applicable authority.

9. Award pre-judgment and post-judgment interest to the extent permitted by law.

10. Award such other and further relief as the Court deems equitable, just, and proper.

**MEESE, EDWARDS, BREEN, CONCIATORI & D'ARMINIO, P.C.**
*Attorneys for Plaintiffs*

By: ______________________________
Karen F. Edler, Esq.

Dated: October 5, 2026

**CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2**

I hereby certify that the matter in controversy is not the subject of any other action pending in any court, arbitration, or administrative proceeding. The administrative proceeding below concluded with the Decision which is final.

I certify under penalty of perjury that the foregoing is true and correct. Executed on October 5, 2026.

**MEESE, EDWARDS, BREEN, CONCIATORI & D'ARMINIO, P.C.**
*Attorneys for Plaintiffs*

By: ______________________________
Karen F. Edler, Esq.

# EXHIBIT A

***State of New Jersey***
OFFICE OF ADMINISTRATIVE LAW

**FINAL DECISION**

OAL DKT. NO. EDS 10170-22

AGENCY DKT. NO. 2023-35080

**S.K. AND D.K., ON BEHALF OF I.K.,**

Petitioners,

v.

**TEANECK TOWNSHIP BOARD OF EDUCATION,**

Respondent.

---

**Karen F. Edler,** Esq., for petitioners (Price, Meese, Shulman & D 'Arminio, P.C., attorneys)

**Arsen Zartarian,** Esq., for respondent (Cleary, Giacobbe, Alfieri, Jacobs, LLC, attorneys)

Record Closed: April 13, 2026 Decided: July 7, 2026

BEFORE **JULIO C. MOREJON,** ALJ:

## STATEMENT OF THE CASE

Petitioners, S.K. and D.K., on behalf of I.K., allege that respondent, Teaneck Township Board of Education, failed to provide I.K. with free appropriate public education and seek out-of-district placement, along with reimbursement of any and all expenses

incurred from the parental unilateral placement, as well as compensatory educational services.

## PROCEDURAL HISTORY

In October 25, 2022, petitioners, S.K. and D.K., (collectively petitioners) on behalf of I.K. (I.K. or Student) filed a Due Process (petition) and Mediation Petition (mediation) with the Office of Special Education (OSE), alleging that the Teaneck Township Board of Education (respondent or the District) did not provide I.K. with an Individualized Education Program (IEP) ensuring I.K. with a Free and Appropriate Public Education (FAPE) and consequently, that the District be ordered to do the following regarding the 2022−2023 school years:

1. Make a Naples Act placement at Aaron School, a private special education day program located at 309 E 45 Street, New York, NY 10017, and fund one hundred percent (100%) of the cost thereof, including transportation.

2. Reimburse petitioners for all expenses incurred in connection with petitioners' unilateral placement of I.K. at Aaron School, including, but not limited to, tuition, transportation, registration fees, books, and any other related expenses for the 2022−2023 school year.

3. Revise I.K.'s IEP to place I.K. at Aaron School and develop appropriate, measurable, and individualized goals and objectives and modifications.

4. Pay any and all costs associated with placing I.K. at Aaron School, including, but not limited to, transportation and any other appropriate related services.

5. Provide I.K. with all compensatory education hours he is owed.

6. Pay petitioners' costs and expenses, including but not limited to attorney fees, witness fees, and expert fees.

On November 15, 2022, OSE transmitted the contested case to the Office of Administrative Law (OAL), where it was filed on said date, under the Administrative Procedure Act, N.J.S.A. 52:14B-1 to -15, and the act establishing the OAL, N.J.S.A.

52:14F-1 to -23, for a hearing under the Uniform Administrative Procedure Rules, N.J.A.C. 1:1-1.1 to -21.6, and the Special Education Program, N.J.A.C. 1:6A-1.1 to -18.5.

On March 29, 2024, with the consent of petitioners, the District filed its Answer to Due Process Petition. On April 10, 2024, with the consent of the District, petitioners filed their Amended Due Process Petition (amended petition), which contained the same allegations and requested relief as the petition but included additional relief for the school years of 2023−2024 and 2024−2025. On June 26, 2024, the District filed its Answer to Amended Petition.

There were seven settlement conferences held, commencing December 2, 2022, through May 22, 2023. On May 23, 2023, the case was then assigned for the purpose of scheduling and conducting a plenary hearing concerning the underlying Due Process Petition filed herein.

An initial telephone status conference was held on May 30, 2023, and the parties requested additional time to continue their settlement negotiations. On August 29, 2023, the parties reported that they could not settle and requested that the matter be scheduled for a hearing. This matter was then scheduled for hearings on March 6, 19, 22, 2024, and April 19, 2024.

On February 27, 2024, prior to the commencement of the hearing scheduled for March 6, 2024, legal counsel for the District requested an adjournment of the scheduled hearings due to the departure from counsel's law firm of the attorney responsible for presenting this matter before the OAL. With the consent of both parties, hearings were scheduled on April 19, 2024, May 15, May 17, May 24, 2024, June 17, 2024, and July 1, 2024.[1] All hearings were held via Zoom on the days scheduled to accommodate petitioner's counsel's request.

---

[1] The hearing transcripts are referred to as herein as 1Tr. (4/19/2024), 2Tr. (5/15/2024), 3Tr. (5/17/2024), 4Tr. (5/24/2024), 5Tr. (6/17/2024), and 6Tr. (7/1/2024).

The following witnesses were called to testify for petitioners: Dr. Jeanne Tighe, SLPD, CCC-SLP, SL/DI, BSC-CL; Tieasha Crawford, M.S.Ed., educational supervisor of the Upper School of Aaron School; and petitioners S.K. and D.K.

The following witnesses were called to testify for the District: Vanessa Lospalluto; Leanna Barbosa, speech-language specialist; Dr. Kristine Thielman, school psychologist; and Janet Seabold, principal of Banyan School.

At the conclusion of the hearing on July 1, 2024, the parties requested time to submit their post-hearing submissions, which was done on August 19, 2024. Due to the voluminous number of joint and party exhibits admitted in evidence, along with reviewing the hearing transcript, the record remained open.

On April 2, 2026, I inquired of counsel for petitioners and the District, requesting supplemental arguments from both parties as to whether an IEP was offered by the District for the 2022−2023 school year, as the record and summations submitted did not fully address this question. On April 13, 2026, the supplemental summations were received, and I closed the record.

## ISSUES

In order for the petitioners to be rewarded reimbursement for costs for the out-of-district placement of I.K. at the Aaron School, it must be established if 1) the District provided a FAPE to I.K. for the 2022−2023, 2023−2024, and 2024−2025 school years, and 2) whether the Aaron School was a proper placement for I.K.?

## FINDINGS OF FACT

Based upon the testimony provided and my assessment of its credibility, together with the documents submitted and my evaluation of their sufficiency, I make the following **FINDINGS** of **FACT**:

Background

The District determined that I.K. was eligible for special education and related services under the classification of communication impairment in 2013. (J-8.) I.K. is diagnosed with developmental language disorder (DLD), which is a communication disorder that interferes with learning, understanding, and using language. These language difficulties are not explained by other conditions, such as hearing loss or autism, or by extenuating circumstances, such as lack of exposure to language. DLD can affect a child's speaking, listening, reading, and writing. (P-1; P-29.) The District continued I.K.'s classification from 2013 through the District's 2021 IEP. (J-8; J-11; J-18.)

2018 Evaluation

On August 28, 2018, Dr. Jeanne Tighe (Dr. Tighe), a speech-language pathologist retained by petitioners, conducted a comprehensive language evaluation and observed I.K. on November 12, 2018, and in his in-district program. (P-1.) Dr. Tighe reported that I.K. exhibits severe deficits in language comprehension skills across word, sentence, and discourse levels. (Id.) Dr. Tighe reported that I.K. exhibits severe deficits in language comprehension skills across word, sentence, and discourse levels. (P-1.)

Dr. Tighe made the following recommendations for I.K.:

1. academic instruction should take place in small groups;
2. a significant portion of I.K.'s day should be devoted to direct instruction in language skills across listening, speaking, reading, and writing modalities;
3. I.K.'s teachers demonstrate sensitivity to the impact of developmental language disorder on classroom communication;
4. highly skilled and specialized reading comprehension instruction;
5. language intervention;

6. expressive language at the discourse level for explanatory purposes;
7. efforts to build I.K.'s vocabulary;
8. incorporation of Lindamood Bell's Visualizing-Verbalizing program;
9. explicit, systematic instruction in written expression, organization, and development;
10. opportunities to practice and apply new spoken and written language skills;
11. intervention to address his development of increasingly mature social communication and cognition; and
12. extended school year to prevent regression.

[Id.]

Dr. Tighe recommended a specialized out-of-district placement with "a more intensive level of language, literacy and social supports." (Id. at 26.) Dr. Tighe did not recommend the Wilson Reading System because most of Wilson is spent doing decoding, reading fluency and spelling, which I.K. was proficient in. (5Tr. 14:5−7, 17−19.)

2019−2020 School Year

On January 24, 2019, during I.K.'s fifth-grade year, the District amended I.K.'s IEP ("Amended IEP"), placing I.K. at Banyan School starting January 10, 2019. (J-7.) The Amended IEP described the reason for the amendment as follows:

> The proposed amendment is to reflect [I.K's] placement at Banyan School, effective 01/10/2019. There will be an IEP meeting in approximately 30 days to review and assess I.'s progress in the program.
>
> Options offered, considered, and rejected:
>
> [I.K.] entered the 5th grade at Benjamin Franklin Middle School on September 5, 2018.

> The following Special Education Programs and Related Services were offered and considered appropriate to meet [I.K.'s] needs for the 2018−2019 school year.
>
> Special Education Program:
>
> - Special Class Mild/Moderate Learning or Language Disabilities
>
> Related Services:
>
> - Speech-Language Therapy − Group, 2x/week for 30 minutes
> - Speech-Language Therapy − Individual, 1x/week for 30 minutes
> - Social Skills Therapy− Group, 1x/week for 30 minutes
> - Counseling Services − Individual, Ix/week 30 minutes
> - Supplemental Reading Instruction − Individual, 2x/week, after school hours for 30 minutes*
>
> *The Supplemental Reading Instruction was never started due to scheduling and location.
>
> Due to several peer conflicts, resulting in negative emotional responses from I., many supportive interventions were put into place. I. continued to experience peer conflicts in school and on the bus and in turn began refusing to attend school. I. was then placed at Banyan School in order to have his severe communication impairment and social skills needs met. The district's program was considered and rejected. The district is in agreement with placement at Banyan School and will conduct a 30-day review to assess I.'s progress in the program.
>
> [Id.]

Upon I.K.'s entrance into Banyan in January 2019, Banyan administered the Woodcock-Johnson Reading Mastery Tests, Third Edition. (J-23.) Although I.K. was in the middle of his fifth-grade year, he achieved the equivalent of a sixth-grade, first-month score on his basic reading skills, which evidenced a personal strength for I.K. (Id.) I.K.'s word attack skills were well above grade level at an eighth-grade, six-month grade equivalency. (Id.) In early 2019, Banyan administered the Word Identification Spelling

Test ("WIST") to I.K., wherein he scored in the average range on the reading and spelling tests. (J-20.)

In early 2019, Banyan also administered the Wilson Assessment of Encoding and Decoding ("WADE") to I.K. for the first time, and the scores evidence I.K's good performance and that he was a good reader. On March 15, 2019, the District held a thirty-day review meeting to review I.K.'s placement at Banyan and issued an IEP ("2019 IEP"). (J-8.) The District placed I.K. in Banyan's Focus Intensive Reading Strategies & Techniques ("FIRST") ("Banyan IEPs"). (J-7; J-8.) The 2019 IEP did not include a social skills class or instruction. (J-8.) I.K. did not achieve a single goal or objective in Speech, Reading, Language Arts, or Social Studies on his first Banyan progress report issued in November 2019, when I.K. was in sixth grade. (J-9.)

I.K. attended Banyan through eighth grade in the 2021−2022 school year. The District's IEPs issued during I.K.'s placement at Banyan from January 2019 through June 2022 placed I.K. in Banyan's FIRST program. (J-8; J-11; J-18.) Banyan's FIRST course is a Wilson intensive course which spans two school periods a day for a total of eighty minutes. (Id.)

2020−2021 School Year

On March 3, 2020, the District's Child Study Team conducted an annual review of I.K.'s IEP. The District issued an IEP ("2020 IEP"). (J-11.) The District's 2020 IEP continued I.K.'s daily Wilson FIRST class for eighty minutes. (Id.) The District's Developmental Reading Assessment ("DRA") scores evidenced that I.K. was still at grade level for reading accuracy and reading fluency, which are the areas Wilson is designed to remediate.

I.K.'s speech and language therapist reported that I.K.'s ability to engage and interact with peers and adults has increased since the start of the school year; however, he continues to require improvements in his receptive, expressive, and pragmatic language skills. (Id.) Additionally, she recommended that I.K. remain in individual speech services to further facilitate his receptive, expressive, and pragmatic language skills and generalize

them across other settings. (Id.) The District's 2020 IEP did not provide I.K. with any social skills class or instruction. (Id.) The District's 2020 IEP maintained a majority of the same speech and language goals and objectives as the District's 2019 IEP and did not increase I.K.'s speech services or language arts instruction. (J-11; J-9.)

Triennial Reevaluations

In May 2021, during I.K.'s sixth-grade year, the District conducted I.K.'s triennial reevaluation. (J-14; J-16; J-17.) The triennial reevaluation reflected that I.K. obtained a general ability index ("GAI") standard score of 94, which falls in the average range; exhibited stronger nonverbal skills and cognitive skills as compared to his verbal cognitive skills; and I.K.'s FSIQ of 80 was impacted by his Verbal Comprehension index, which was his most significant area of weakness. (J-16.)

In the May 2021 triennial reevaluation, the District also administered I.K. the Comprehensive Assessment of Spoken Language, 2nd Edition ("CASL-2"). (J-17.) The CASL-2 2021 scores reflected that I.K.'s General Language Ability Index of 64 placed him in the first percentile, which, when compared to I.K.'s receptive vocabulary standard score of 66, was a 10-point reduction from the CASL-2 conducted by the District in 2018. The CASL-2 2021 score also showed that I.K.'s sentence expression standard score of 78 was an 11-point reduction from respondent's 2018 CASL-2 testing, and I.K.'s non-literal language standard score in the CASL-2 2021 decreased by eight points from the District's CASL-2 2018 testing. (J-2; J-17.)

In the May 2021 triennial reevaluation, the District also conducted an educational evaluation and administered the Woodcock-Johnson Tests of Achievement – 4th Edition ("WJ-IV") to I.K. (J-14.) The WJ-IV reflected that I.K.'s scores decreased in: academic skills score in 2021 decreased by eleven points from the District's WJ-IV testing in 2018 (J-3; J-23; J-14), and his academic fluency score in 2021 decreased by twelve points from the District's testing in 2018. (J-3; J-23; J-14.) I.K.'s academic applications score in 2021 decreased by eight points from the District's testing in 2018 (J-3; J-23; J-14), and his brief achievement score in May 2021 decreased by seven points from the District's testing in 2018. (J-3; J-24; J-14.) I.K.'s broad achievement score in May 2021

decreased by ten points from the District's testing in 2018. (Id.) I.K.'s reading comprehension was a grade level equivalent of grade 2.9 in his sixth-grade year, evidence of his language disability. (J-14.)

2021−2022 School Year

On June 4, 2021, the District's Child Study Team conducted a reevaluation of eligibility determination with annual review IEP meeting. (J-18.) The District issued an IEP on June 4, 2021 ("2021 IEP"), (J-18), in which the District determined that I.K. continued to be eligible for special education and related services under the classification of communication-impaired and continued I.K.'s placement at Banyan for his eighth-grade 2021−2022 school year. The 2021 IEP continued the same programming as the District's 2020 IEP, despite a lack of progress and I.K.'s reevaluation results. (Id.) The 2021 IEP did not provide I.K. with the related service of social skills despite the negative impact of his DLD on his socialization. (Id.) The District's 2021 IEP maintained a majority of the same goals and objectives as the 2020 IEP, despite I.K.'s lack of mastery of the 2020 IEP goals and objectives.

Banyan's DRA scores placed I.K.'s basic reading skills, including decoding and reading fluency, at or above grade level. Banyan's WADE scores place I.K. at grade level for basic reading skills. The 2021 IEP continued I.K.'s placement in an eighty-minute "double period" of Wilson FIRST despite I.K.'s grade-level reading skills. (J-18.) The 2021 IEP stated that I.K.'s "communication impairment is impacting listening, speaking, reading, writing and socialization." (J-18 at 182, 199−203.) Respondent's 2021 IEP did not include goals and objectives to address I.K.'s socialization deficits. (Id.) The 2021 IEP did not provide I.K. with the related services of social skills or counseling, despite the District's reason for placing I.K. at Banyan to address: "in order to have his severe communication impairment and social skills needs met." (J-7 at 043; 1Tr. 116:6−12.)

The 2021 IEP (J-18) was the last agreed-upon IEP. The May 19, 2022, IEP meeting was the last IEP meeting held. (J-20.) The District's last proposed IEP was the 2022 IEP for the 2022−2023 school year. (Id.) However, petitioners argued that the copy of the IEP provided in the May 2022 IEP contained the word "draft," which was different

from the copy of the IEP produced in the discovery exchange. The District has not proposed IEP's for the 2023−2024 or 2024−2025 school years. Petitioners unilaterally placed I.K. in Aaron for the 2023−2024 and 2024−2025 school years. Petitioners have not re-enrolled I.K. in the District or made a request by the District for evaluations of I.K. for the 2023−2024 or 2024−2025 school years.

Due Process Petition filed October 25, 2022

1. 2022−2023 School Year

On May 19, 2022, in anticipation of I.K.'s upcoming commencement of high school in the ninth grade, the District convened an annual review IEP meeting (the "May 2022 IEP Meeting") and issued a "draft IEP" the day prior, on May 18, 2022 (the "May 2022 IEP"), comprising two separate documents, one prepared by Banyan and one written by the District, which incorporated the Banyan IEP document. (3Tr. 153:4−17; J-20). The District's May 2022 IEP reflected placement at Banyan School for the 2022−2023 school year on the District's IEP document and "Out of District" for the 2022−2023 "Projected School/Location" on Banyan's IEP document. The May 2022 IEP "special alerts" section on the cover of the IEP states: "Please note this IEP has been proposed by the Teaneck School District CST and is currently in due process. [I.K.] has been parentally placed at The Aaron School." (J-20.)

At the May 2022 IEP meeting, the District did not discuss compensatory education despite its May 2022 IEP stating: "The purpose of the IEP meeting is to discuss the need for compensatory education and services for the period of March 18, 2020, through September 1, 2021." (Id.)

At the May 2022 IEP meeting, petitioners shared that I.K. was on the verge of school refusal. I.K. repeatedly expressed wanting a new placement for high school. At the May 2022 IEP meeting, petitioners requested that the District seek an alternative placement for high school, and the District agreed to explore a new out-of-district placement for I.K. as he entered high school. In addition, the District agreed to send records to a number of out-of-district day-placement schools, including The Craig School,

Community School, and Winston Prep (J-21) and asked if petitioners had any other suggestions.

The District sent I.K.'s records to Winston Preparatory High School, The Craig School, The Community School, and Honor Ridge Academy. (P-2; P-6; J-20.) Petitioners were open to any of the proposed placements and attended intakes at Community School, Banyan Upper School, and Honor Ridge Academy. Winston Preparatory High School and Craig School rejected I.K.'s application. I.K. was not accepted into any of the proposed placements. (P-4; P-6.) I.K. was not accepted by any of the out-of-district schools to which the District submitted his records.

The May 2022 IEP provided the following data from the Wilson Assessment of Decoding and Encoding ("WADE") administered by Banyan. His reading scores from September 2021 to April 2022 were as follows:

- Total Sounds: 91 to 102
- Reading High Frequency Words: 56 to 57
- Reading Regular Words: 118 decreases to 116
- Reading Pseudo Words: 60 to 60
- Total Reading: 234 decreases to 233

[J-20.]

The May 2022 IEP evidenced that I.K.'s reading level at the end of eighth grade, per administration of the Developmental Reading Assessment-2 ("DRA-2"), was a level 70, which correlates to a seventh-grade level and is below grade level. Upon admission to Banyan, his DRA at the end of fifth grade was a 40, which correlates to a fourth-grade reading level. I.K.'s reading gap of at least one to two grade levels remains unchanged after more than three years at Banyan-the IEP placement. The Banyan placement did not close I.K.'s reading gap. (Id.)

The May 2022 IEP indicated that Banyan assessed I.K. at a fourth- to fifth-grade math level. It was reported that upon entry in Banyan, he was at a fourth-grade level for math. The Banyan programming and placement did not progress I.K. in the area of math.

(Id.) The Draft May 2022 IEP provided that Banyan proposed reducing speech and language services for the 2022−2023 school year despite I.K.'s communication impairment classification and the decline in scores on his prior speech and language evaluation. (Id.)

The May 2022 IEP provided no goals and objectives to address I.K.'s social and emotional needs, despite its IEP stating that his "communication impairment is impacting listening, speaking, reading, writing and socialization"; no driven social skills despite its IEP stating that his "communication impairment is impacting listening, speaking, reading, writing and socialization." The May 2022 IEP reduced I.K.'s speech services. (Id.)

Petitioners requested that the District consider Aaron School as a potential placement. Petitioners subsequently requested a copy of the records that the District had submitted to Community School, Honor Ridge and Craig to send to the Aaron School, which the District did not provide. Petitioners sent the records in their possession to Aaron School, and Aaron offered I.K. an intake. Petitioners requested that the District attend the intake, which the District did not do. During the summer of 2022, petitioners repeatedly asked about the status of a high school placement for I.K., but they did not receive a response.

On July 25, 2022, I.K. was accepted and offered a place at the Aaron School for the 2022−2023 school year. (P-11; P-12.) On August 10, 2022, petitioners sent the District a unilateral placement notice, advising the District that petitioners intended to place I.K. at the Aaron School for the 2022−2023 school year. (P-13.) The Aaron School is not a New Jersey Department of Education-approved private school for students with disabilities, whether in-State or out-of-State.

2. 2023−2024 School Year (Placement at Aaron School)

I.K. attended Aaron for the entire 2023−2024 school year.[2] Aaron is a private K-12 special education school that follows New York State standards and curriculum and is accredited by the Middle States Association of Colleges and Schools and the National Independent Private Schools Association. Aaron serves students with learning disabilities, DLD, and social challenges. Aaron's curriculum places heavy focus on intensive language instruction and provides several team-taught classes by speech-language pathologists and other specialists.

During his ninth-grade year, I.K. had three periods per day directly addressing the components of communication. In the second half of the year, I.K. took Responsibilities & Choices I as a second course in the social skills curriculum. At Aaron, I.K. has an educational team consisting of "head teachers, assistant teachers, any related service providers" (3Tr. 46:14−16) that has meetings to discuss specific issues with the cohort. I.K.'s academic classes are team-taught by a "head teacher and an assistant teacher." (3Tr. 47:3−10; P-22.) Head teachers have master's degrees, and the assistant teachers have a minimum of a bachelor's degree. (Id.) I.K. is placed in a cohort of nine students with the same areas of need in terms of academic and social functioning.

Aaron students must take final exams in each content area class. Aaron also tracks student progress "using individualized goals and objectives developed by each teacher." (3Tr. 100:9−20). Progress reports are provided at the end of each semester. (P-22; P-26; P-32.) Aaron holds case study meetings, which are run by the school psychologist and provide staff with "multiple opportunities to address individual student challenges and develop individualized plans." (3Tr. 64:8−25.) Aaron further provides parent training through its guidance and transition counselors. (3Tr. 52:4−9.) Aaron's speech pathologist provides training to staff on "basic writing skills and thinking maps." (3Tr. 50:12−14.)

[2] The hearings in this matter were held and concluded between April 2024 and July 2024, while I.K. was a student at Aaron School in the 2023−2024 school year.

In ninth grade, I.K. was enrolled in "Applied" English, biology and global history courses, which are courses that are individualized, allow for differentiation to the students' learning styles, and provide a slower pace of instruction. (3Tr. 59:7−23; P-22; P-36; P-39.) I.K. was also enrolled in writer's composition and public speaking (taught by a speech language pathologist) and "Advance class and Forum class" (taught by a school psychologist). (3Tr. 35:16−24, 51:6−9.) "Forum" class is a small group counseling class, and "Advance" class is an executive functioning course, which is scheduled during the first period every day for each academic year. (Id.; P-22; P-25; P-38.)

I.K. was also enrolled in a social skills course called Responsibilities and Choice, which was co-taught by a speech-language pathologist and a school psychologist. During ninth grade, Aaron's speech pathologist provided push-in speech services for I.K. for two full periods. (P-26; P-40.) In tenth grade, I.K. was enrolled in "Applied" American Literature, which is co-taught with a speech-language pathologist, as well as "Applied" Chemistry and United States History. (3Tr. 60:24−61:3.) He was also re-enrolled in Responsibilities and Choices, co-taught by two school psychologists, Forum, and Advance class. (P-32.)

I.K. received the following grades at Aaron for the 2022−2023 school year: Applied English 9 – A, Algebra 1 – B, Math Applications 1 – A-, Applied Biology – B+, Applied Global History – A, Global Art Perspectives – A, and Writer's Composition 1/Public Speaking – A. (P 28.) Aaron offered to continue I.K. for his 2024−2025 school year. On April 10, 2024, petitioners, through counsel, issued a unilateral placement letter for the 2024−2025 school year. (P-57.)

Petitioners testified regarding the costs expended for tuition and transportation for each school year at Aaron. (4Tr. 28:13−19; P-15; P-16; P-62; P-63.) The transportation expenses testified to were for the 2023−2024 school year and were not complete, as the hearings ended in July 2024. (Id.) Petitioners will have continuing tuition and transportation costs for so long as I.K. remains at Aaron. (Id.)

Due Process Petition filed April 10, 2024

School Year 2024−2025

Petitioners issued a unilateral placement notice on April 10, 2024, notifying the District of their intent to continue I.K.'s placement at Aaron for the 2024−2025 school year and their request for reimbursement of the same. The District agreed to consent to petitioners' amending their petition to include the 2024−2025 school year and seek reimbursement from the District. Petitioner's unilateral placement notice was served simultaneously with this Amended Due Process Petition in light of the parties' agreement.

Testimony

Respondent's Witnesses:

The District called the following individuals to testify: Vanessa Lospalluto, M.S.Ed., LDT-C, learning disability teacher consultant; Dr. Kristine Thielman, school psychologist, preschool and elementary school child study team coordinator; Leana Barbosa, S.L.P., speech/language pathologist; and Janet Seabold, principal, Banyan High School.

Vanessa Lospalluto

Vanessa Lospalluto (Lospalluto) has been employed by the District for eighteen years. For the past seven years, Lospalluto has been the learning disabilities teacher consultant (LDTC) on a child study team and a case manager at Teaneck High School. Prior to her current position, she was a special education teacher for eleven years and has taught various programs within the District, such as an LLD program, language and learning disabilities program, self-contained and in-class support, a resource room for reading and math, and a multiple disabilities program. Lospalluto has a master's in special education; is a certified learning disabilities teacher consultant; a special education teacher; general education teacher, pre-K through 3; Orton-Gillingham reading teacher; and an adjunct professor for Fairleigh Dickinson University in the teacher training program, also teaching Orton-Gillingham.

Lospalluto was qualified as an expert in LDTC. Lospalluto was not I.K.'s case manager (although she was "part of the team"), and she did not recall "making specific recommendations." (1Tr. 93:16.) Lospalluto also did not recall attending any of I.K.'s IEP meetings "from 2018 or '19 to the present time." (1Tr. 93:7−10.) Lospalluto did not evaluate I.K.

Lospalutto testified that the District's Educational Evaluation utilized the Woodcock-Johnson IV Test of Achievement, which examines a student's academic achievement in the areas of reading, writing and math, the scores of which are then compared to same-age peers. She testified that any standard score between 90 and 110 is considered to be in the average range compared to peers of the same age. Lospalutto testified that I.K.'s scores show that his area of strength would be his basic reading skills, where he had a score of 88 (low average range). His reading comprehension was in the low range with a 73, which demonstrates that he has reading comprehension deficits and areas of need, and his reading fluency was also in the low range with a 76, indicating that he does need extra time on reading tasks.

Lospalutto stated that the evaluation showed that I.K.'s math calculation skills are shown to be in the low average range, and his math problem-solving was a 67 (very low range), and that he has math deficits. She stated that this result was largely due to language, and so he struggled more with the word problems but did a better job with numbers and calculation skills.

Lospalutto testified that I.K.'s writing scores showed written expression was in the low average range, spelling was an 89 (one point below the average range), and overall written language was in the low average range. When all three areas (reading, writing, and math) are considered, I.K.'s broad academic achievement was a 76 (low range). Lospalutto testified that the subtest called "Applied Problems" statistically shows that I.K.'s math problem-solving was an area of deficit for him. Lospalutto stated that based on I.K.'s speech and language evaluation, he was classified with a communication impairment, and so his deficits are in language.

Lospalutto testified that the IEP for the 2021−22 school year, when I.K. was in eighth grade, includes the present levels and progress from the prior (2021) year and that the IEP shows a summary of the programming that he was having and that he was placed in a full-day language and learning disabilities program at Banyan School. (J-18.)

Lospalutto testified that the Banyan School is a state-approved, out-of-district, self-contained school specifically geared towards students with significant language and learning disabilities. She stated that at Banyan School, I.K. was in a self-contained program full day, also receiving related services of speech and language therapy twice a week in a pull-out group and once a week individually and also receiving special transportation.

Lospalutto testified that the 2021 IEP's goals and objectives were derived directly from the Banyan School teachers, who provide the District with summaries, progress, and assessments. Lospalutto testified that the 2021 IEP reading goals contain specific identified goals and then different objectives that target those particular goals. She stated that one of the programs utilized at Banyan to monitor reading progress is called "FIRST," which is an acronym for Focus Intensive Reading Strategies and Techniques, and the goals and objectives of which are derived from the assessment results. It has various goals, and then various specific objectives need to be met. Lospalutto stated that the goals and objectives used by Banyan that addressed I.K.'s language deficits had various literacy and basic reading skills that are highly connected to his area of need and are all very data-driven. They did a lot of assessments and then focused on the targeted areas based on those results.

Lospalutto testified that Banyan administered the Developmental Reading Assessment (DRA), which showed I.K.'s level of reading was a level 60 (equivalent to sixth grade); his fluency rate at an independent level of 80, with an 80 regarding I.K.'s accuracy in oral reading; and then when Banyan measured it with his comprehension, I.K.'s independent level was a 40 (approximately fourth grade). Lospalutto testified that the DAR showed that I.K. scored an instructional reading level of 80 with his rate and his comprehension at a level of 50.

Lospalutto then testified that Banyan reported that when I.K. was re-administered the DAR at the end of the school year in May 2021, the DAR showed that his words per minute were a 60, his independent level was at an 80, and his comprehension did increase from a 40 to a 60, so he went from a fourth-grade level to a sixth-grade level at the time.

Lospalutto testified that based on the DAR test results reported by the Banyan School, I.K. demonstrated some increase in his reading comprehension, which is his area of deficit; he performed much better in reading words and fluency. Lospalutto testified that Banyan uses the Wilson Reading Program assessment called the Wilson Assessment of Decoding and Encoding (WADE) assessment. Lospalutto testified that, similar to the DRA, Banyan administered the WADE assessment in September 2020 and again in May 2021, which showed percentages for decoding fluency of phonetically regular words presented in isolation, decoding high-frequency regular words, spelling phonetically regular words, spelling high frequency, and then the application of those in our writing-dictated sentences. I.K. showed growth in all areas, but especially in the areas in which he was really struggling. Based on these progress reports, she found the goals proposed for the 2021−22 school year to be appropriate.

Lospalutto testified that the Banyan progress report shows that I.K. made overall progress but continued to need support in those areas in which he has specific language and learning deficits. Lospalutto testified that there are areas of the progress report that show that I.K. mastered many particular goals and showed progress on others, and some that say, "Not introduced," which could indicate that they have not started working on that yet. (1Tr. 62:10−17.) Lospalluto testified that based upon her review of the progress report, it appeared that I.K. made a lot of academic gains in the goals, especially with his education, in many areas of math and language arts, and even with his area of deficit, which is speech.

Lospalutto testified as to sections of the 2021 IEP regarding Goals and Objective Progress Report, Training Minds to Comprehend, and Reading and Spelling Words. (J-22.) Overall, Lospalluto's testimony regarding the 2021 IEP indicated I.K. was making progress in reading class; making progress in Training Minds to Comprehend, but he

continued to need support; some mastery and some areas of progression in his Reading and Spelling Words section; and progressing towards three initial goals in language arts. (1Tr. 68:11−15; 68:17−25.)

Lospalutto testified that I.K. ended his eighth-grade year at Banyan School with "good academic achievement." (1Tr. 70:3−9; J-12.) Lospalluto testified that I.K. was demonstrating strong academic achievements in his core subjects plus electives, including Reading, Writing, Math, Science and Social Studies. Lospalutto testified that, based on I.K.'s report card, together with the progress report for the 2021−22 school year, her assessment is that I.K. had a successful year with very specific areas of strength and areas of need, and he did make progress towards those goals. (1Tr. 70:25−71:7.)

Lospalutto testified that the PLAAFP (Present Levels of Academic Achievement and Functional) Section of the May 2022 IEP (J-20) shows that Teaneck did a pre-DRA (Developmental Reading Assessment) in September 2021 and a post-DRA in May 2022 in order to see I.K.'s progression towards his independent and instructional reading levels, which showed that I.K.'s independent reading rate went from a level 60 (Grade 6) to a level 70 (Grade 7). (1Tr. 72:21−72:3; J-20.) Lospalutto testified that the PLAAFP also reveals that I.K.'s independent oral reading fluency was at a level 70, and his instructional rate was at a level 80. Lospalutto stated that the PLAAFP indicated I.K. was getting close to grade level, and with the teacher's support, the scaffolding, and all of the instruction, he made a lot of growth and continued to show growth in all areas, fluency, rate, and comprehension. Lospalutto testified that the pre- and post-WADE (Wilson Assessment of Decoding and Encoding) disclosed that I.K.'s percentages rose from a total of 61 to 79, so overall, I.K. made a lot of progress in various areas of growth based on his post-WADE assessment at the end of his eighth grade.

Lospalutto testified that the goals and objectives listed in the May 2022 IEP addressed I.K.'s areas of deficit based on the progress he was making in his coursework, which included science and math. She considered the May 2022 IEP appropriate for I.K. Lospalutto testified that even though I.K.'s reading levels showed him at one to two levels below grade level and unchanged after more than three years at the Banyan School, he

still showed growth because he is a student with significant language and learning deficits.

Lospalutto testified that the Banyan program was specifically geared to all learning and language needs and is very tailored, individualized, and systematic to target students with learning and language needs, which I.K. required. She further testified that language needs are global and affect everything that you do in learning, and that I.K. needs explicit instruction in every area of academics. Lospalutto testified that a student with a communication impairment has specific language deficits, whereas a student with a traditional reading disability has only a severe discrepancy in reading, but I.K.'s language deficits are going to affect him globally, and you will see areas of need in reading, writing, and math.

Lospalutto testified that the Banyan program has a lot of very specific, tailored programs for students with learning disabilities. Lospalutto stated that I.K.'s needs were related to comprehension, so the Banyan program would place him in an English language class and a comprehension class, and then the third reading class would be based on how he scores/needs. Lospalutto testified that the Banyan program is very highly individualized and very tailored to match specific needs, and they have an accelerated curriculum. She stated that every student at the Banyan School had a teacher and a paraprofessional assigned, and the largest group was an English 9 class, which would be your more traditional English class, and there were seven students, one teacher, three paraprofessionals, and they had a lot of scaffolding, a lot of repetition, and a lot of the things that you want to see when students have these deficits.

Lospalutto testified that she visited the Aaron School, and her assessment of the Aaron program was that it was based on a general education curriculum in a small group with students with language and learning disabilities. Lospalutto testified that the Aaron School students with language and learning deficits are grouped together without an individualized program for each student and a speech and language therapist who pushes into the English class twice a week.

Lospalutto testified that Aaron's curriculum and electives were different than the District's. She stated that Aaron did not have many electives compared to the District. With regard to the least restrictive environment, Lospalutto had some concerns regarding Aaron, such as the hour commute and traffic. Lospalutto testified that she had observed I.K. in his chemistry class, where she noted that there was not a lot of language instruction and that I.K. did not have a lot of interaction with his peers or staff. Lospalutto also testified that she was able to see I.K.'s computer screen during the observation and noticed that he had a lot of errors. Lospalutto further testified that the Aaron School did not provide any type of scaffolding, support or help.

Lospalutto testified that the Banyan School would be the appropriate program for I.K. because it can target I.K.'s language and learning deficits very specifically, very closely monitoring his needs; it is very direct, very intensive, and it is not only appropriate but a "model program." (1Tr. 90:12−18.)

Lospalluto testified that I.K. did not have a specific reading disability but instead has an overall communication and language impairment that impacts I.K.'s functioning. abilities in comprehension, reading, writing, words, everything, even math. Lospalluto testified that interventions and programs to teach a reading issue or a language issue would go hand in hand, meaning that I.K. would benefit from direct and explicit structured curriculum programming in general that targeted his greatest area of deficits, comprehension, and his writing and math.

Lospalutto testified that I.K. would receive meaningful benefit from Wilson reading programming because the lesson is more than reading and spelling, as it progresses from reading into fluency and then, typically with Orton-Gillingham methodologies in general, depending on the student's level.

Lospalutto testified that her assessment of the first paragraph of I.K.'s 2019−20 IEP (J-8) was that I.K. made a significant amount of progress; however, he still needed to continue in the program. Lospalutto testified that based on her review of the 2021 and 2022 progress reports and the 2021 grades, I.K. received meaningful benefit and appropriate instruction. He had good academic achievement and made meaningful

gains; the IEP for said years was an appropriate program. Lospalluto advised that the Banyan School would be the appropriate program because they are a school that is able to target I.K.'s language and learning deficits specifically and closely monitor his needs.

Kristine M. Thielman, Psy.D.

Kristine Thielman, PhD (Dr. Thielman) has a doctorate in psychology and is a licensed psychologist in the State of New Jersey, as well as a supervisor certificate in the State of New Jersey. Dr. Thielman was qualified as an expert in the field of psychology. Dr. Thielman served as a school psychologist for the District for seven years, and her duties and responsibilities include case management, working on the child study team, completing evaluations, including psychological evaluations, assisting with out-of-district placements, counseling, and any sort of clinical needs at Teaneck High School.

Thielman's testimony explained the District's 2021 psychological evaluation of I.K. and the resulting WISC scores. Thielman testified that the testing psychologist noted I.K.'s previous full-scale IQ of 77 and a diagnosis of ADHD, anxiety, and severe speech and language impairment. (J-16.) Dr. Thielman testified that she never evaluated I.K. or worked with I.K. in any capacity while he was in-district. Dr. Thielman was not his case manager during I.K.'s tenure at Banyan.

Dr. Thielman testified that the 2020−21 progress report from Banyan, when I.K. was in seventh grade, shows that in the third marking period, I.K. was making progress in many areas but had limited progress in retelling and sequential order. (J-15.) Dr. Thielman stated that this report shows that I.K. was making progress commensurate with his cognitive ability.

Dr. Thielman testified that the 2020−21 progress report from Banyan for the last marking period in I.K.'s eighth-grade year shows that I.K. was progressing. (J-22). Dr. Thielman testified that the progress report did not show any areas where I.K. was making limited progress or no progress at all.

On cross-examination, Dr. Thielman acknowledged that the psychological evaluation provided that I.K.'s non-verbal cognitive skills are stronger than his verbal cognitive skills. (J-16.) Dr. Thielman also stated that in reviewing the progress report (J-15), she could not speak to why things were introduced, reintroduced or not. "The speech therapist would have to speak to that, but I do see that he's continuing to work on his problem-solving skills. He's improved his understanding and ability to infer and understand facts versus opinions. Keep up the good work. So, when I read that as a case manager, it doesn't come off to me that he's not making progress." (2T:29:20−25, 30:2.)

<u>Leanna Barbosa</u>

Leanna Barbosa (Barbosa) testified that she is currently employed at Teaneck Public Schools as a speech and language specialist and has been employed with Teaneck for seventeen years. Barbosa testified that she has certificates in the following areas: standard teacher of the handicapped certification, K through 12; speech and language specialist certification; (R-4.) Barbosa was admitted as a speech-language pathologist expert in the field of speech and language pathology.

Barbosa testified that she was familiar with the May 2021 Speech and Language Evaluation of I.K. (J-7.) She testified that she has administered these tests previously and that the purpose of the test is to determine the student's communication and language abilities to assist in creating the appropriate programming and goals and objectives for the student.

Barbosa testified that an area of significant weakness for I.K. would be in non-literal language, like metaphors, idioms, similes, and things like that, so his vocabulary and expressive vocabulary scores were lower than the expressive one-word score. Barbosa testified that the type of program she would recommend for I.K. would be a program that would reinforce and give him strategies in order to develop his language skills so that he could communicate and participate within the classroom to the best of his ability.

Barbosa testified as to the comprehensive assessment of spoken language, the second edition test (CASL), which is an overall language test. Barbosa testified that I.K.'s test score on the CASL was a 66, which she stated revealed I.K. to have pragmatic language issues, and she would want him to have speech therapy that also concentrated on his understanding of interpersonal skills, something similar to a language learning disabilities (LLD) classroom and speech therapy.

Barbosa testified that I.K. fits the profile of communication impaired, which is a language disability, so she would recommend both a pull-out speech therapy session and a push-in speech therapy session. Barbosa testified that I.K. needs help with language skills to assist him with math, science, social studies, language arts, and reading. She testified that an appropriate program for I.K. would include reading instruction, encoding and decoding as part of the language instruction, and that language is the overall umbrella and then the reading.

Barbosa then testified regarding the June 2021 IEP. (J-18.) Barbosa testified that the proposed IEP offered speech and language twice a week in a small setting and that a recommendation was made to have the service provided to I.K. once a week individually and twice a week in a small group. Barbosa testified that the proposed June 2021 IEP reflected that I.K. gains in speech and language skills. Barbosa further testified that the proposed IEP included social goals and indicated that Banyan uses the social thinking program, which teaches children to read straight from it, and social programs that help teach I.K. to stop and assess social situations at the moment. Banyan presents different social scenarios, and then they work with the child in order to give them strategies on how they would act within that social scenario. Barbosa testified that the last paragraph in this section of the proposed IEP says I.K. gained in overall speech and language skills − that he is more of an active participant, and pragmatic skills, intelligibility, language and critical thinking have all shown improvement, and that they would like to continue the service.

Barbosa testified that she would place I.K. in a pull-out environment first so that she could give the skills and strategies in more of a controlled environment, and then, when speech providers push into the classroom, that allows her to see if there was

generalization, carryover, and also give reminders of the strategies that were being presented first within the small group instruction.

Barbosa testified that the first speech goal for the next IEP year is for awareness and intelligibility of his own speech, and this speaks to his articulation issues and has to do with self-monitoring and self-corrections. She stated that pragmatic language skills are those conversational skills and interpersonal skills and verbal skills that are spoken. Barbosa testified that the goals are to use effective communication skills within the school setting with various audiences – peers and staff − also being able to read non-verbal messages − facial cuing, expressions and gestures − and distinguish between relevant and irrelevant information. She explained that part of the goals was to be able to provide reasons or rationales for what is being said, which all address interpersonal skills and help I.K. understand how to speak to peers and staff or teachers, and then move to his daily life.

Barbosa testified that her assessment of the proposed June 2021 IEP is that I.K. was progressing in some things, some things were recently introduced, and some things were not yet introduced, but that he was progressing in the areas that she would expect. Barbosa testified that the section of Present Levels from the IEP from May 2022 through May 2023, towards the end of I.K.'s eighth-grade year, which reports on progress from the prior year, shows that I.K. has weaknesses in expressive language, especially related to pragmatics and his overall speech intelligibility. (J-20.)

Barbosa testified that the speech goals contained in the IEP is to improve I.K.’s intelligibility; strategies and the next three all have to do with social scenarios and pragmatics and how to interact within those and giving him strategies like identifying disguise thoughts, indirect comments and sarcasm, understanding people's implied meanings, answer how and why questions related to social situations, agreeing and disagreeing and once again making sure that he is articulating clearly while reading and during structured speaking tasks. Barbosa stated that these goals address I.K.'s deficits and that the 2021−22 progress report, recorded on June 7, 2022, shows that I.K. is making progress in his articulation, an ongoing goal for him. (J-22.)

Barbosa testified that she observed the Banyan program in April 2024, believes this program is appropriate for I.K. Barbosa testified that she also observed the Aaron School in April 2024 and observed the student's English language class, which comprised of eight students, the speech-language pathologist, a teacher and a paraprofessional, and was co-taught by the speech therapist and the special ed teacher. She stated that the program she observed did not have individualized speech, and she did not observe many strategies being taught in the lesson.

On the cross-examination, Barbosa testified that she observed Banyan prior to I.K.'s placement and again immediately prior to the commencement of testimony in this matter but never observed I.K. when he was at Banyan. Barbosa stated that she was not on I.K.'s IEP team when he was at Banyan. She was not involved in creating the IEP for I.K. when he went to Banyan. Barbosa testified that she did not write the speech and language goals for that IEP, and she had no other interaction with I.K. at Banayan after his placement. Barbosa stated that she only observed I.K. at Aaron prior to the first hearing date.

Janet Seabold

Respondent next called Janet Seabold (Seabold), principal at Banyan, to testify. Seabold has been with Banyan for two years and previously worked in various positions, from principal to curriculum director to director of special education for Ridgefield Public Schools for thirty-one years. Seabold holds certifications as a teacher of the handicapped, principal, supervisor, and provisional superintendent.

Seabold testified that Banyan is a specialized program for students with language disorders. Seabold testified that Banyan is a Wilson partner school, and they use the Wilson program in the area of ELA and reading. Seabold stated that Banyan uses Lindamood Bell, Visualizing and Verbalizing in the reading comprehension classes as well as the standard English curriculum because they are a state-approved high school for students with special needs, as well as the other areas like math, science, social studies, world language, PE, art, and offers a work-based learning curriculum, such as work-based learning experiences out in the community for transition.

Seabold testified that for students who are communication-impaired or who have language disabilities, Banyan uses Lindamood Bell and the Wilson program in the area of reading, and they use social thinking in the area of social-emotional communication. She stated that the speech therapist would work with students in the area of any individual needs for speech and language and whatever is in the IEP goals and objectives.

Seabold testified that she is familiar with the Wilson program. Seabold testified that if a student does not require Wilson, the student could then be placed in an English and reading comprehension class, in which they use Lindamood Bell Visualizing and Verbalizing, where they focus specifically on visualizing concepts to learn comprehension.

Seabold testified that not all students who attend Banyan take Wilson. Seabold stated that all classes in Banyan would adjust to a student who requires assistance with grammar, construction, fluency and vocabulary, but more specifically, it would happen in the English portion of their ELA, which is also part of the graduation requirements.

Seabold testified that once a student has completed the Wilson program, which is a twelve-level program, they would then receive the Lindamood Bell comprehension class, where they spend a period each day just working on comprehension strategies, reading comprehension, applying strategies, and citing evidence, those types of skills, in addition to the more typical high school English class. Seabold stated that Banyan has three speech and language therapists, and the services offered are dependent on the IEP. She stated that class size for academic classes is six to seven students, and there is at least one teacher and one paraprofessional, depending on the needs of the students, but it can be greater than that.

Seabold testified that Banyan offers an executive functioning program containing an elective class called Work-Based Learning, wherein they address future programming for students and preparing for the world beyond high school. Seabold testified that all teachers at Banyan are trained in social thinking, and the students have an optional program called “Lunch Bunch,” which is a group where the students can apply different

social skills during lunch. Seabold stated that if a student requires counseling, or it is IBP-directed, the students can receive individual or group counseling, and they also have a behaviorist on staff who can work with a student if we need to develop strategies or a behavior plan for a student.

Seabold testified that Banyan has social opportunities or extracurricular activities, in the form of various clubs, like woodshop, cooking, or movie club, a basketball team, and a cheerleading squad. She stated Banyan also has an optional after-school program called "Social for Life," which offers students the opportunity to remain at school twice a month and go on various community-based field trips where they can socialize and be with their peers out in the community.

On cross-examination, Seabold stated that she had met I.K. once and had not reviewed his academic record. Seabold stated that the Lunch Break program is not included in the IEP but is left to the high school students to select. Seabold further testified that she did not know what program Banyan had offered I.K.

Petitioners' Witnesses:

Petitioners each testified, and they called upon Tieasha Crawford, educational supervisor at the Aaron School, and Jeanne Tighe, speech-language pathology doctor (SLPD) (BCSCL), board certification within speech and language pathology. Below is a summary of the relevant information from the petitioner's witnesses.

Tieasha Crawford

Tieasha Crawford (Crawford) testified for petitioners. Crawford testified that she is the educational supervisor at the Aaron School and has been working there for nine years. She holds a New York State professional certification in biology and in general science. Crawford started at the Aaron School in 2015 as an eighth-grade science teacher until she became educational supervisor last year (2022−23).

Crawford testified that she has a teaching certificate in science but does not hold an administrator's certificate or endorsement, a school psychologist certificate or endorsement, or a speech and language certificate, nor does she have a school social worker or any kind of counseling or therapist credential. She has never worked in any public school system. Crawford stated that she supervises the teachers at Aaron School and conducts their evaluations.

Crawford stated that Aaron is a private K-12 special education school that follows New York State standards and curriculum and is accredited by the Middle States Association of Colleges and Schools and the National Independent Private Schools Association. She stated that Aaron serves students with learning disabilities, DLD, and social challenges. Crawford stated that Aaron's curriculum places heavy focus on intensive language instruction and provides several team-taught classes by speech-language pathologists and other specialists.

Crawford stated that during I.K.'s ninth-grade year at Aaron, he had three class periods per day directly addressing the components of communication. (P-22.) Crawford stated that in the second half of the year, I.K. took Responsibilities & Choices I, as a second course in the social skills curriculum. (P-40.) Crawford testified that in ninth grade, I.K. was enrolled in "Applied" English, biology and global history courses, which are courses that are individualized, allow for differentiation to the students' learning styles, and provide a slower pace of instruction. (P-22; Ex. P-36; P-39.) She stated further that I.K. was also enrolled in writer's composition and public speaking (taught by a speech-language pathologist) and Advance class and Forum (taught by a school psychologist). (P-22; P-25; P-38.) Crawford stated that Forum is a small group counseling class, and Advance class is an executive functioning course that is scheduled during the first period every day for each academic year. (P-35.)

Crawford stated that I.K. was also enrolled in a social skills course called Responsibilities and Choice, which was co-taught by a speech-language pathologist and school psychologist. (P-26; P-40.) She stated that during ninth grade, Aaron's speech pathologist provided push-in speech services for I.K. for two full periods. (P-26.)

Crawford testified that in tenth grade, I.K. was enrolled in "Applied" American Literature, which is co-taught with a speech-language pathologist, as well as "Applied" Chemistry and United States History. (P-32.) She stated that in tenth grade, I.K. was also re-enrolled in Responsibilities and Choices, co-taught by two school psychologists, Forum, and Advance class. (P-32.)

Crawford stated that at Aaron, I.K. is assigned an educational team consisting of head teachers, assistant teachers, and any related service providers, and that they hold meetings to discuss specific issues with the cohort, and I.K. is "team taught" by a head teacher and an assistant teacher. (P-22.) Crawford testified that at Aaron, head teachers have master's degrees and the assistant teachers have a minimum of a bachelor's degree. (Id.) I.K. is placed in a cohort of nine students with the same areas of need in terms of academic and social functioning.

Crawford testified that Aaron uses the same grading policy for each course, utilizing daily "do-nows" and homework, which is given at least three times per week in each class. (P-38.) She stated further that students must take final exams in each content area class and that Aaron also tracks student progress using individualized goals and objectives developed by each teacher and issues progress reports at the end of each semester. Aaron holds case study meetings, which are run by the school psychologist and provide staff with multiple opportunities to address individual student challenges and develop individualized plans, and Aaron's speech pathologist provides training to staff on basic writing skills and thinking maps. (P-22; P-26; P-32.)

On cross-examination, Crawford testified that the Aaron School is accredited by the Middle States Association of Colleges and Schools as well as the National Independent Private Schools Association, and that the curriculum taught at the Aaron School is for all content area classes in English, history, science, and math. Crawford testified that Aaron's curriculum is the same as that used in the New York State public school system; however, Aaron modifies their curriculum in terms of teaching students with disabilities, but it does not have any specialized reading programs.

Crawford testified that she was unaware that art, PE and health are part of New Jersey and are not electives; and that Aaron only offers art, PE and health as electives, plus clubs and related service courses. Crawford stated that Aaron provides "push-in speech" in terms of speech services but does not deliver pull-out individual therapy or pull-out group therapy.

D.K.

D.K. testified that at the May IEP meeting, she and her husband informed the District that I.K. was very unhappy at Banyan to the point of being on the verge of school refusal and that I.K. needed different programming. D.K. stated that they asked the District to change I.K.'s IEP placement and programming by placing him in a different out-of-district school.

D.K. testified regarding the May 19, 2022, IEP meeting. She stated that immediately prior to the meeting, the District provided them with a "draft copy" of an IEP and that the District never provided them with a May 2022 IEP after the meeting. D.K. testified that the copy provided to her in the hearing did not contain the word "draft" on the IEP when compared to the proposed IEP in evidence. (J-20; 3Tr.153:4−18). D.K. also testified that the District never issued an IEP to petitioners for the 2022−2023 school year.

D.K. testified that the District agreed to send I.K.'s records to out-of-district schools, including The Craig School, Community School, and Winston. (J-20.) D.K. stated that they also asked the District to propose other potential placements, and the District agreed and forwarded I.K.'s records to Winston Preparatory High School.

D.K. testified that they were amenable to any of the proposed placements and attended intakes at Community School, Banyan Upper School, and Honor Ridge Academy. She said that Winston Preparatory High School and Craig School rejected I.K.'s application and that I.K. was not accepted into any of the proposed placements.

D.K. testified that Aaron accepted I.K. on July 22, 2022 (P-12) and that they served the District with their unilateral placement notice on August 10, 2022. (P-10.) D.K. stated that they did not hear from the District after the unilateral placement letter.

D.K. testified that the commute from their residence to the Aaron School is somewhere between forty−sixty minutes with a driver, depending on traffic. D.K. stated that they had also hired David Speilman (Speilman)(P-21) to drive I.K. to Aaron on days that he could not take public transportation, or they could not drive him. She stated they paid Speilman on a daily basis, including his EZ Pass costs. (P-60.)

D.K. testified that when I.K. took public transportation (bus first, then train), it would also depend on traffic, but it usually takes about an hour and fifteen or twenty minutes, the latter if he walks rather than taking the train. She stated that it could be as short as an hour and twenty minutes in the aggregate, up to two and a half hours, round-trip.

S.K.

S.K. testified concerning the travel expenses that petitioners incurred for I.K.'s placement at Aaron. (P-44 to P-56). S.K. testified that said expenses incorporated the cost for Speilman, including gas and tolls, and the transportation costs incurred by petitioners for Uber drivers, tolls, mileage, and parking, when petitioners took I.K. to Aaron.

S.K. testified to preparing Excel spreadsheets that contained school transportation expenses for the school years of 2022−2023 and 2023 through the beginning of 2024. (P-62, Ninth Grade 2022−2023 Travel Expenses, for Spelman; P-63, Tenth Grade 2023−2024 Travel Expenses, for petitioners.)

Jeanne Tighe

Jeanne Tighe (Dr. Tighe) testified as an expert. Dr. Tighe has a doctorate in speech-language pathology; is a board-certified specialist in child language, IDA/CERI-certified structure language/dyslexia Interventionist and a Wilson Dyslexia

practitioner. Dr. Tighe first evaluated I.K. in August 2018 and observed him in his in-district program on November 12, 2018. (P-1; P-59.)

Dr. Tighe testified that she first evaluated I.K. in the summer of 2018 when he was a rising fifth grader and when his parents reached out to her to request that she conduct a language evaluation of I.K. because they had concerns about difficulties he was having in school at the time. Dr. Tighe evaluated I.K. for the 2018−19 school year, and petitioners contacted her again in 2023 for a reevaluation of I.K.

Dr. Tighe testified that she did not have any further input or interaction with petitioners or the district in terms of programming for I.K. after her 2018 report until 2023, in conjunction with doing the second evaluation. Dr. Tighe testified that it was already well documented that I.K. had a language disorder when she evaluated him in 2018. Dr. Tighe stated the parents asked her to help assess I.K.'s language skills and development education and examine his program. Dr. Tighe stated that the overall assessment she developed was consistent with I.K.'s history of severe DLD.

Dr. Tighe stated that DLD impacts I.K.'s "listening, speaking, reading, writing and socialization." (P-1 at 024; 5Tr. 19:4−11.) However, I.K.'s "word identification, reading fluency, spelling skills were solidly average, very typical for his age whereas all the other components of language semantic, morphological, syntactic, pragmatic, all the meaningful and structural components of language were impaired." (5Tr. 11:17−22.) Dr. Tighe testified that I.K does not present with a broad intellectual disability. Rather, I.K.'s DLD assessment presents with a "language portion of his cognition that is severely and very specifically impaired." (5Tr. 54:18−20.) She stated that this is a very typical profile for students with DLD. (5Tr. 55:3−6.) "I.K. has a real dissonance that he lives with, which is. . . challenging for him that he's an intelligent individual with typical general thinking ability and yet – he experiences these severe barriers to participation in academics and in social interaction because of his language deficits." (5Tr. 55:4−11.)

Dr. Tighe testified that her overall recommendation was that I.K. needed a specialized out-of-district placement, and she offered a list of recommendations in her evaluation that had features of a program that met I.K.'s needs, particularly with respect

to language, which is his primary area of disability. She stated that the information she provided to petitioners was elements of specialized reading comprehension instruction and specialized explicit systematic writing instruction, along with a description of key components, that would be included in an appropriate program for I.K.

Dr. Tighe opined that I.K. did not need Wilson reading and that I.K. did not need pull-out speech and language as a service for his developmental language disorder. Dr. Tighe stated that she recommended I.K. needed careful, language-based, systematic, broken-down, explicit comprehension instruction that incorporated building the language skills that he needs to understand what he reads. Dr. Tighe opined that I.K. never required Wilson instruction during his time at Banyan, commencing January 2019 through May 2022.

Dr. Tighe reviewed the WADE data in the IEP, and her opinion was that Wilson instruction was not appropriate for I.K. Dr. Tighe testified that "[t]here is no indication in any of the history that I.K. ever needed Wilson intervention, that that was ever an appropriate fit for his individual needs." (5Tr. 103:16-22; P-50 at 278.) Dr. Tighe stated that the District's claimed progress of I.K.'s WADE testing is immaterial.

Dr. Tighe reevaluated I.K. in May 2023. (P-29.) She stated that I.K.'s DLD continued to globally impact him in all aspects of communication. She concluded that I.K. demonstrated the same patterns of weakness from 2018, in that he was proficient in decoding and reading fluency but very impaired in reading comprehension. Dr. Tighe testified that I.K. was able to decode "exceptionally well." (5Tr. 39:4.)

Dr. Tighe stated that I.K.'s challenges with reading fluency continued to be due to his language impairment as a result of his restricted vocabulary and his language-based reading errors, not decoding. In 2023, Dr. Tighe concluded that I.K.'s reading comprehension was that of a fourth grader based on the administration of a variety of assessments. (P-29 at 152−154.)

Dr. Tighe testified that she observed I.K. at the Aaron School, and she noted he interacted with peers in structured activities and teacher-directed activities, and he

partnered with a peer and worked collaboratively, which went well, but she did notice that he did not socialize in free moments and did not have a group of pals in the hallway as you might often see with a high schooler. Dr. Tighe stated that I.K. was less social overall in the time that she saw him and that the same could be reflective of a challenge, in that I.K. did not seem to have close peer relationships, but he was functioning socially in the classroom within the directed context.

Dr. Tighe testified that the presence of speech and language pathologists in his program is important for I.K. because he has a language disability, and he had multiple periods throughout his day when a speech and language pathologist was actually teaching the class, so there was a heavy presence of that language specialist role in the school, and the instruction was very skill-based, explicit, sequential, and structured.

On cross-examination, Dr. Tighe affirmed that she is a reading specialist and a speech and language specialist, and she is not a certified special education teacher, nor is she a certified reading specialist; she does not hold an administrative or supervisory certification. Dr. Tighe further admitted that she is not an LDTC, social worker, or school psychologist. Dr. Tighe also conceded that the last time she worked as a speech pathologist in a school was in Pennsylvania in 2002, and she has never worked as a speech and language specialist or a speech pathologist in New Jersey.

Dr. Tighe testified that she saw I.K. in 2019 and generated a report and then had no other involvement with him until 2023. She testified that the purpose of her 2023 evaluation was to reevaluate him and to offer an opinion on the proposed program.

Dr. Tighe testified that she did not observe I.K. at Banyan between 2018 and 2023, but she did observe him at Banyan after I.K. was unilaterally placed at Aaron. Dr. Tighe stated that she did not evaluate I.K.'s needs for the 2020−21, 2021−22 or 2022−23 school years and had no involvement with I.K. until the IEPs were all generated and formulated by the educators who were dealing with I.K.

Dr. Tighe testified that her familiarity with I.K. was a result of her 2018 evaluation of I.K. and that she did not have direct personal knowledge of changes that would have

occurred during those times. Dr. Tighe testified that she is very familiar with the Banyan lower school and less so with the high school. She stated that she has testified as an expert and recommended Banyan before in a case where Banyan was proposing a program. Dr. Tighe characterized Banyan as generally having an extensive language component.

Dr. Tighe acknowledged that the Training Minds for Comprehension (TMC) program is a period a day where they focus on reading comprehension primarily through the use of Lindamood-Bell's Visualizing and Verbalizing intervention, which is a comprehension-focused intervention.

Dr. Tighe stated that she would generally agree that Wilson is a supplemental instructional tool in the curriculum, as opposed to the crux of the curriculum. She further agreed that Wilson or Orton-Gillingham are not the only interventions in the curriculum at Banyan School and that decoding and encoding are only parts of the Wilson program, which in turn is only a component of the Banyan program.

Dr. Tighe acknowledged that the global art perspective section of the report card narrative from Aaron includes the notation. "I.K. also required redirection, using the Aaron School SOAR model." (P-22.) She further testified that the Math Applications section of Exhibit P-26 states, "Due to his sensitivity to loud noises and his tendency to become distracted and overwhelmed by extraneous sound, I required prompts to utilize earbuds to reduce the impact of these sounds." (5Tr. 129:24−130:22; P-26.)

Dr. Tighe testified that she did not feel that the integrated speech model was a concern because I.K. could be distracted, despite documentation of I.K.'s distractibility from multiple Aaron teachers. Dr. Tighe testified that the first bullet point of her report states that the design of the Aaron program includes an intensive language focus. However, she admitted that she was not testifying that Banyan does not include an intensive language focus because she did observe a supplemental comprehension class that was available to the students which would bring in some additional language instruction, and she acknowledges that Banyan High School is very much used to working

with students with language disorders, but she had concerns for I.K. about what she saw in the classes when she was at Banayan.

With regard to her claim in her expert report that "several" classes at Aaron were co-taught by speech and language specialists, on cross-examination, Dr. Tighe conceded that in the ninth grade, only two of the student's classes were team-taught and only one in grade ten. (P-26.) Dr. Tighe agreed that the speech goals on the proposed IEP were relevant for I.K. (J-20; J-25.) Dr. Tighe also admitted that there are skills that should be taught explicitly in direct instruction and then applied, and that can happen in a pull-out session.

Dr. Tighe expressed a concern that there was "only a single mention of anything related to reading comprehension" and lots of goals related to decoding and encoding, and she does not believe that is appropriate for I.K. (5Tr. 136:7−25; P-29.)

Credibility

Credibility is the value a fact finder assigns to the testimony of a witness, and it incorporates the overall assessment of the witness's story, considering its rationality, consistency, and how it comports with other evidence. Carbo v. United States, 314 F.2d 718 (9th Cir. 1963); see In re Polk, 90 N.J. 550 (1982). Credibility findings "are often influenced by matters such as observations of the character and demeanor of witnesses and common human experience that are not transmitted by the record." State v. Locurto, 157 N.J. 463, 474 (1999). A fact finder is expected to base decisions on credibility on his or her common sense, intuition, or experience. Barnes v. United States, 412 U.S. 837 (1973).

The finder of fact is not bound to believe the testimony of any witness, and credibility does not automatically rest astride the party with more witnesses. In re Perrone, 5 N.J. 514 (1950). Testimony may be disbelieved but may not be disregarded at an administrative proceeding. Middletown Twp. v. Murdoch, 73 N.J. Super. 511 (App. Div. 1962). Credible testimony must not only proceed from the mouth of credible witnesses but must be credible in itself. Spagnuolo v. Bonnet, 16 N.J. 546 (1954).

The difference between "credibility" and "persuasiveness" was recently discussed by the United States Supreme Court in Garland v. Ming Dai, 593 U.S. 357, 371−72 (2021). The Garland Court stated:

> Admittedly, credibility and persuasiveness are closely bound concepts, sometimes treated interchangeably, and the line between them doesn't have to be drawn the same way in every legal context. But the distinctions. . . aren't entirely unfamiliar either. Take an example. Suppose a plaintiff is doing her best to recount a car accident to prove her case for damages. She testifies earnestly that she thought the traffic light was green when she entered an intersection. The plaintiff says she was then broadsided by the defendant who was traveling on a cross street and ran a red light. Later in the proceedings, however, the defendant presents video footage and the testimony of other witnesses, all of which show that it was really the plaintiff who drove through a red light and the defendant who had the right of way. It's easy enough to imagine that a factfinder might not describe the plaintiff as lacking credibility—in the sense that she was lying or not "worthy of belief," Black's Law Dictionary 448 (10th ed. 2014) (defining "credibility")——yet find that her testimony on a key fact was outweighed by other evidence and thus unpersuasive or insufficient to prove the defendant's liability. It's not always the case that credibility equals factual accuracy, nor does it guarantee a legal victor.
>
> [Id.]

The District called the following individuals to testify: Vanessa Lospalluto, M.S.Ed., LDT-C, learning disability teacher consultant; Dr. Kristine Thielman, school psychologist, preschool and elementary school Child Study Team coordinator; Leana Barbosa, S.L.P., speech−language pathologist; and Janet Seabold, principal, Banyan High School.

All four of the District's witnesses testified in a straightforward, professional and direct manner. Nothing about their demeanor or comportment suggested anything but truthful responses to the questions posed. Therefore, I **FIND** said witnesses credible and their testimony as **FACT** herein.

A discussion concerning whether the testimony of these was persuasive will follow.

Here, although I have made a finding that Lospalluto was credible, I **FIND** that her testimony was not persuasive because Lospalluto testified that Banyan was appropriate for I.K., but she did not provide specific reasons or rationale to substantiate that opinion. Although Lospalluto was qualified as an expert in LDTC, she was not I.K.'s case manager (although she was part of the child study team), and she did not recall making specific recommendations. Lospalluto also testified that she did not recall attending any of I.K.'s IEP meetings from 2018 to the time of the hearing. Lospalluto did not evaluate I.K. Lospalluto testified that she knew and was familiar with I.K. because he was at Whittier Elementary and Benjamin Franklin Middle School, where I.K. had attended prior to Banyan, as she was on the IEP team at both schools.

For the foregoing reasons, I **FIND** that Lospalluto's testimony reveals she had little familiarity with I.K. at best, and her testimony was not persuasive in establishing that the District was providing I.K. with FAPE.

Here, although I have made a finding that Thielman was credible, I **FIND** that her testimony was not persuasive because Thielman never evaluated I.K. or worked with I.K. in any capacity while he was in-district; Thielman was not his case manager during I.K.'s tenure at Banyan. Thielman's opinion rendered in the hearing did not address that I.K.'s only speech goal, and four of five objectives were not introduced or introduced in I.K.'s DLD.

Additionally, Thielman's statement that no "limited progress" designations equate to progress contradicts her testimony stating that the District's May 2021 progress report, which had "limited progress" designations evidenced that I.K. was "making progress commensurate with his ability." I **FIND** that Thielman's contradictory testimony makes her opinion regarding I.K.'s progress suspect at best.

Here, although I have made a finding that Barbosa was credible, I **FIND** that her testimony was not persuasive because, despite testifying to the contents of the 2021−2011 IEP, 2022−2023 IEP, and the speech and language evaluation (J-17), she was not on I.K.'s IEP team at Banyan; she did not write the speech and language goals

for the IEP. Further, Barbosa observed Banyan prior to I.K.'s placement and again immediately prior to the commencement of testimony in this matter, but never observed I.K. when he was at Banyan, which leads me to believe that Barbosa observed the Banyan program only because of this petition and not as part of the development of I.K.'s IEP necessary for District to provide I.K. with FAPE.

Here, although I have made a finding that Seabold was credible, I **FIND** that her testimony was not persuasive regarding the District providing I.K. with a FAPE, as she testified as to Banyan's use of the Wilson program in the area of ELA and reading but her testimony did not address I.K.'s IEP or placement at Banyan.

The following individuals testified during the presentation of the petitioner's case: petitioners, S.K. and D.K.; Tieasha Crawford, educational supervisor at the Aaron School; and Jeanne Tighe, speech-language pathology doctor (SLPD) (BCSCL), board certification in speech and language pathology.

Petitioners S.K. and D.K. testified frankly and sincerely in describing I.K.'s placement and experience at Banyan High School and the Aaron School, respectively. They provided detailed testimony concerning their involvement with the District in addressing I.K.'s special education needs. I **FIND** the petitioners' testimony to be credible and as **FACT** herein.

Crawford provided professional testimony concerning her educational and professional qualifications, as well as straightforward testimony regarding the Aaron School and their educational programs. Crawford's testimony was consistent with the documents entered in evidence, and I therefore **FIND** her testimony credible and as **FACT** herein.

I **FIND** that Dr. Tighe provided testimony that was professional and straightforward concerning her educational and professional qualifications in speech pathology and expertise as a Wilson Dyslexia Practitioner (previously a Wilson Level I Practitioner). She intensively and extensively evaluated and observed I.K. in 2018 and again in 2023.

Dr. Tighe testified consistently throughout that I.K. did not need Wilson instruction at Banyan, as she was clear in her assessment that any progress by I.K. in his Wilson instruction at Banyan was immaterial to the Wilson program. Dr. Tighe provided an unwavering opinion that there is no indication in any of the history that I.K. ever needed Wilson intervention and that Wilson was ever an appropriate fit for I.K.'s individual needs. Dr. Tighe's finding came despite her high regard for the program overall.

Here, I **FIND** that Dr. Tighe's testimony is credible as she has presented testimony that is steadfast concerning the program that affords I.K. with a FAPE. Her testimony set forth methodically and professionally why the proposed Wilson program and the support services provided by the District did not provide I.K. with FAPE.

In addition, I **FIND** Dr. Tighe's testimony is also persuasive as she was the only person admitted as an expert in DLD in this proceeding. Dr. Tighe had more familiarity with and knowledge of I.K. than the District's experts. Dr. Tighe evaluated I.K. two times, five years apart, in 2018 and 2023. Dr. Tighe observed I.K. in his in-district program and later at Aaron. She also observed the Banyan program set forth in respondent's internal IEP, which respondent never sent to petitioners or Banyan. Dr. Tighe concluded that I.K. demonstrated the same patterns of weakness in 2023 that he had in 2018, in that he was proficient in decoding and reading fluency but very impaired in reading comprehension. Dr. Tighe testified that I.K. was able to decode exceptionally well, but his challenges with reading fluency continued due to his language impairment as a result of his restricted vocabulary and his language-based reading errors, not decoding.

## LEGAL ANALYSIS AND CONCLUSIONS OF LAW

In order for the petitioners to be rewarded reimbursement for costs for the out-of-district placement of I.K. at the Aaron School, it must be established if 1) the District provided FAPE to I.K. for the school years of 2022−2023, 2023−2024, and 2024−2025, and 2) the Aaron School was a proper placement for I.K.?

New Jersey, as a recipient of Federal funds under the Individual with Disabilities Education Act (IDEA) 20 U.S.C. §1400 et seq., must have a policy that assures all children

with disabilities the right to a free appropriate public education (FAPE). 20 U.S.C. §1412. IDEA defines FAPE as special education and related services that are provided at public expense, under public supervision and direction, without charge; that meet the standards of the state educational agency that include an appropriate preschool, elementary school or secondary school education in the State involved; and that are provided in conformity with an IEP. 34 C.F.R. § 300.17; 20 U.S.C. § 1401(9); N.J.A.C. 6A:14-1.1 et seq.

It is well established that parents who unilaterally withdraw their child from public school and place them in private school without consent from the school district "do so at their own financial risk." School Comm'n of Burlington v. Dep't of Educ. of Mass., 471 U.S. 359, 374 (1985). They may be entitled to reimbursement for the costs of their unilateral private placement only if a court finds that the proposed IEP was inappropriate and the placement was appropriate under the IDEA. 20 U.S.C. § 1412(a)(10)(C)(ii).

As such, two factual findings must be made before awarding reimbursement for the costs of a unilateral placement: (1) the school district failed to provide a FAPE to the student, and (2) the placement selected by the parents was proper. School Comn'n of Burlington v. Dep't of Educ. of Mass., 471 U.S. 359, 369−70 (1985). Since the Burlington decision, its holding has been adopted by both Congress and the United States Department of Education. 20 U.S.C. § 1412(a)(10)(C); 34 C.F.R. 300.403(c) (2005). A discussion of the same will follow.

1. Did the school district provide a FAPE to the student?

In a due process hearing in which the question is whether the District has fulfilled its statutory responsibility to provide a FAPE, the District bears the burden of proving, by a preponderance of the evidence, that it has met its legal obligation. Lascari v. Bd. of Ed. of the Ramapo-Indian Hills Reg'l Sch. Dist., 116 N.J. 30, 45 (1989). In providing a student with a FAPE, a school district must provide such related services and supports that are necessary to enable the disabled child to benefit from the education. Hendrick Hudson Dist. Bd. of Educ. v. Rowley, 458 U.S. 176, 188−89, 102 S. Ct. 3034 (1982). In fulfilling its FAPE obligation, the District must develop an IEP "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." Endrew v.

Douglas Cnty. Sch. Dist. RE–1, 137 S. Ct. 988 (2017) required schools to provide students an education that is "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances."

The Supreme Court noted in Rowley that judges have no expertise in the area of special education, and as such, they must rely upon the determinations of special education experts. Rowley, 458 U.S. at 208. Of course, judges have expertise in resolving disputed questions of fact according to the preponderance of the evidence presented. Id. at 206−207. The Court should review such testimony and other relevant evidence and determine, according to the preponderance of the evidence standard, the appropriate placement for the child in light of the statutory indication in favor of "mainstreaming" and after appropriate consideration of the conclusion of those involved in the child's placement.

In order to provide a FAPE, a school district must develop and implement an IEP. N.J.A.C. 6A:14-3.7. An IEP is "a comprehensive statement of the educational needs of a handicapped child and the specially designed instruction and related services to be employed to meet those needs." Sch. Comm. of Burlington v. Dept. of Educ. of Mass., 471 U.S. 359, 368, 105 S.Ct. 1996, 2002, 85 L.Ed. 2d 385, 394 (1985). The educational opportunities provided by a public school system will differ from student to student, based upon the "myriad of factors that might affect a particular student's ability to assimilate information presented in the classroom." Rowley, 458 U.S. at 198. The Rowley Court recognized that measuring educational benefit is a fact-sensitive, highly individualized inquiry.

In assessing whether the District offered a FAPE, the focus is on the IEP, which the Supreme Court has referred to as the "modus operandi of the Act." Burlington Sch. Comm. v. Dep't of Educ., 471 U.S. 359, 368 (1985). Again, in Honig v Doe, 484 U.S. 305 (1988), the Supreme Court stated that "[t]he IEP is the primary vehicle for delivering the appropriate educational services to each disabled child" and further described the IEP as the "centerpiece of the statute's education delivery system for disabled children." 484 U.S. at 311.

The Due Process Petition filed herein asserts that the District failed to provide I.K. with a FAPE for the 2022−2023 school year. Petitioners would later declare in an Amended Petition for Due Process that the District failed to provide I.K. with a FAPE for the 2023−2024 and 2024−2025 school years. However, the gravamen of petitioners' claim is that the District failed to provide the student with a FAPE for the 2022−2023 school year, as the parents enrolled I.K. at the Aaron School in the 2023−2024 school year. The significant event in the 2022−2023 school year, which caused petitioners to claim that the District failed to provide the student with a FAPE, and their decision to enroll I.K. at the Aaron School, occurred at the May 19, 2022, IEP meeting. (J-20.) The fundamental question requiring an answer to petitioners' claim that I.K. was not provided with a FAPE in the 2022−2023 school year is whether the District provided petitioners with an IEP.

The record reveals that the District determined I.K. was eligible for special education and related services under the legal category of communication impairment from 2013 through 2022. The last agreed-upon IEP was the 2021−2022 IEP. The record further reflects that the District placed I.K. at the Banyan School in order to have his severe communication impairment and social skills needs met. The District had determined that I.K. had a severe developmental language disorder ("DLD"), and he did not have a specific learning disability in reading.

The record further reveals that by the time the May 19, 2022, IEP meeting occurred, there was a question of whether the District's IEP and placement of I.K. at the Banyan School should continue. Prior to I.K. commencing at Banyan in January 2019, the District incorporated Dr. Tighe's 2018 evaluation of him in the District's IEP for I.K.'s school years at Banyan. Dr. Tighe's 2018 evaluation recommended a specialized out-of-district placement with "a more intensive level of language, literacy and social supports." (P-1 at 026.) Dr. Tighe explicitly did not recommend the Wilson Reading System because most of Wilson is spent doing decoding, reading fluency and spelling, which I.K. was proficient in.

Despite the District's reason for placing I.K. at Banyan, the Banyan IEPs focused on providing I.K. with Wilson reading instruction. As the record reflects, prior to I.K.'s

placement at Banyan in 2019, he achieved average scores in the areas of reading and spelling, indicating that he did not exhibit deficits in these subject areas upon his entry to Banyan. As Dr. Tighe testified, Wilson is an "instructional intervention designed to help students who struggle with basic skills of reading words. So, identifying written words accurately, reading fluently, spelling words and therefore writing with clarity through spelling. . . generally considered a primary dyslexia intervention." (4Tr. 130:14−20.) It is an "instructional intervention designed to help students who struggle with basic skills of reading words." (4Tr. 130:14−20.) As Dr. Tighe opined, based on the WIST and WADE testing data administered throughout I.K.'s time at Banyan, he did not require Wilson instruction. (5Tr. 98:20−99:1, 103:7−22.)

The District's witnesses' testimony evidences the District's inaccurate belief that I.K. needed Wilson reading instruction to address his severe DLD despite his grade level or above basic reading skills outlined in the District's Banyan IEPs. As a result, the District's Banyan IEPs are written more as though I.K. was diagnosed with dyslexia instead of severe DLD. While the District's expert, Lospalluto, testified that the WADE evidenced growth, Dr. Tighe opined that I.K. never required Wilson instruction to begin with. Dr. Tighe concluded that any alleged progress on the WADE testing is immaterial. Dr. Tighe reviewed the WADE data, and her opinion (year after year) is that Wilson instruction was not appropriate for I.K. Dr. Tighe testified that "[t]here is no indication in any of the history that I.K. ever needed Wilson intervention, that that was ever an appropriate fit for his individual needs." (5Tr. 103:16−22.) The District's Banyan IEPs did not satisfy the District's IEP-stated justification for placing I.K. at Banyan: "in order to have his severe communication impairment and social skills needs met." (Ex. J at ; 1Tr. 116:6−12.)

In reviewing the testimony and the records admitted into evidence, it is clear that the District did not develop an appropriate IEP for I.K., and thus I **CONCLUDE** that the District failed to prove by a preponderance of the evidence that it provided I.K. with a FAPE for the 2022−2023 school year, as the District's Banyan IEPs for I.K. did not address I.K.'s severe DLD or his social needs. I further **CONCLUDE** that the District's proposed program fails to meet the standards required by law and denies I.K. the free, appropriate public education to which he is entitled. The testimony and evidence

presented by petitioners and outlined above in the Findings of Facts clearly reflect that the District's program not only failed to provide I.K. with a program in which significant and meaningful progress could occur, but also shows that, in fact, I.K. did not make meaningful progress in light of his circumstances (he regressed) and therefore denied I.K. a free and appropriate public education.

As part of their claim that the District failed to provide I.K. with a FAPE, petitioners have argued that the District failed to provide I.K. with any IEP for the 2022−2023, 2023−2024, and 2024−2025 school years, inasmuch as the District failed to deliver an IEP to petitioners, let alone that the District's IEP failed to provide the appropriate programs for I.K.

Petitioners contend that the District did not offer and did not prove that they offered a "draft IEP." Petitioners argue that the IEP presented to the parents at the May 19, 2022, IEP meeting was an "Internal IEP"[3] for the 2022–2023 school year, and any argument that the District's Internal IEP is a finalized version of respondent's "draft IEP" (the "draft IEP")[4] is erroneous.

Specifically, the record reflects, and the District does not deny, that petitioners received a proposed IEP at the May 19, 2022, IEP meeting designating Banyan as the proposed program. (P-5; P-59.) In response to that offered program, petitioner D.K. testified that petitioners had concerns about Banyan being the appropriate placement for the student. (4Tr. 8:14−19.) D.K. also specifically testified regarding a conversation at the May 19, 2022, meeting about the proposed placement of Banyan, explaining that petitioners were not satisfied with that proposal, prompting the District to suggest three other schools to visit. (4Tr.110:21−25.) On June 7, 2022, the District's case manager informed petitioners that Banyan proposed several dates for a tour (P-5.) D.K. testified that after the May 19, 2022, IEP meeting, the District scheduled an intake at the Banyan School. (4Tr. 20:5−8.) D.K. testified that she and her husband attended the intake at Banyan. (4Tr. 21:5−7.)

---

[3] Petitioners' Trial Brief p. 5 defined Ex. J-20 as "Respondent's Internal IEP" because it was not offered to petitioners or Banyan. This definition is continued in Petitioners' Supplemental Letter Brief.
[4] This draft IEP is not in evidence. (3Tr. 152:4–53:4.)

Petitioners actually recount these facts in their due process petition, in which they acknowledge that the District offered an IEP and program at the May 19, 2022, IEP meeting. Petitioners admit that a draft May 2022 IEP was issued. (Petition at ¶ 29.) The petition contains multiple references to that draft IEP, including alleged deficiencies therein, which obviously form the basis of the claim that the District allegedly failed to offer FAPE. (Petition at ¶ ¶ 35−36, 38, 40−46, 53−56, 86, 94, 96, 97, 98, 99.) The petition also states that the proposed program for the 2022−23 school year was Banyan and claims that the proposed IEP "evidences that Banyan proposed reducing speech and language services for the 2022−23 school year," (Id. at ¶ 40) (emphasis added); "Respondent's placement at Banyan does not include a social skills or counseling course," Id. at ¶ 87; and "Respondent's placement at Banyan does not include an executive functioning course." (Id. at ¶ 88.) The petition also confirms that the District representatives advised petitioners that the student could attend Banyan without the need for a "shadow day." (Id. at ¶ 68.)

Similarly, the Amended Due Process Petition contains more detailed allegations regarding the draft May 2022 IEP, to wit: "Respondent convened an annual review IEP meeting on May 19, 2022 (the "May 2022 IEP Meeting") and issued a draft IEP the day prior on May 18, 2024 (the "Draft May 2022 IEP"), comprising two separate documents, one prepared by Banyan and one written by respondent which incorporated the Banyan IEP document. I.K. was in eighth grade. Respondent's Draft May 2022 IEP reflected placement at "Banyan School" for the 2022−2023 school year on respondent's IEP document and "Out Of District" for the 2022−2023 "Projected School/Location" on Banyan's IEP document. (Amended Petition at ¶ ¶ 24−25.) In addition, the amended petition contains numerous references to the proposed May 2022 IEP. (Amended Petition at ¶ ¶ 48−50, 54−55.) The amended petition then asserts numerous times that "Respondent's May 2022 and Final May 2022 IEP [in the record as J-20] were inappropriate." (Id. at ¶¶ 79−82.)

It is evident from the foregoing record that petitioners are challenging the program that they contend was never offered for the 2022−2023 school year. Thus, I **CONCLUDE** that petitioners' argument and proofs are flawed, and I **CONCLUDE** the "Draft IEP"

offered by the District at the May 19, 2022, contains the District's offered program for I.K. for the 2022−2023 school year, which formed the basis for petitioners' Due Process Petition. It is not uncommon that a district offers an out-of-district placement. The program is offered by way of the draft IEP at the IEP meeting, and the IEP is thereafter finalized, generally in what is known as a "30-day meeting." In this matter, I.K. had applied to Aaron School and was accepted on July 25, 2022. (P-11; P-12.) Thereafter, petitioners sent a unilateral placement notice to the District. (P-13.)

I **CONCLUDE** that in accordance with procedure, the District finalized the proposed 2022−23 IEP for Banyan, in the record as J-20. Indeed, D.K. testified that J-20 was similar to the IEP presented to her, but the IEP was in draft form, and now it is a final version. (4Tr. 110:3−11.)

Finally, with regard to petitioners' claims that the District did not issue an IEP for I.K. for the 2023−2024 and 2024−2025 school years, petitioners' claim is diminished by the fact that I.K. was enrolled in a unilateral placement of petitioners' own selection, had commenced this litigation, and never made any request to return to the District, scheduled a meeting, or requested an IEP from the District. Under these circumstances, the District has no obligation to issue an IEP.

Determining whether the District denied I.K. a FAPE by failing to develop an IEP or offering an appropriate placement depends on whether the District had a continuing duty to identify, evaluate, or offer FAPE after the parent unilaterally placed the child in a private school. When a parent unilaterally places their child in a private school, the public school district is generally not required to provide the full range of services or develop an annual IEP for that child. See 20 U.S.C. § 1412(a)(10)(A)(i) (outlining a district's responsibilities for children enrolled in private schools, which do not include maintaining an IEP).

However, this obligation can be reactivated if the parent demonstrates an intent to re-enroll the child in public school or requests an evaluation with that intention. Courts have held that a district must evaluate the child and propose an IEP once the parent seeks re-enrollment or requests such evaluations. See Moorestown Bd. of Educ. v. S.D.,

811 F. Supp. 2d 1057 (D.N.J. 2011); I.H. v. Cumberland Valley Sch. Dist., 842 F. Supp. 2d 762 (M.D. Pa. 2012). Accordingly, the central issue in determining whether the District denied FAPE is whether the parent indicated an intent to re-enroll the student in public school or otherwise requested an evaluation triggering the District's duty.

Here, no proofs have been presented that once the parents unilaterally placed I.K. at the Aaron School, they communicated any intent to re-enroll I.K. at the District or request an evaluation from the District for the 2023−2024 and 2024−2025 school years. As such, I **CONCLUDE** that the District did not fail to provide I.K. with a FAPE for the 2023−2024 and 2024−2025 school years.

2) Was the placement selected by the parents proper:

If an educational agency failed to provide a student with a FAPE, the court is broadly empowered to fashion relief that is appropriate in light of the purpose of the IDEA. School Comm'n of Burlington v. Mass. Dept. of Educ., 471 U.S. 359, 369 (1985). The right of parents to make unilateral private placements when they disagree with the educational programs provided to their disabled children is well established. In the Burlington case, the United States Supreme Court held that the IDEA empowers courts to order school authorities to reimburse parents for their expenditures on private special education for a child if the court ultimately determines that such placement is proper under the IDEA. Ibid. This was considered to be a valid exercise of the courts' broad powers to ensure that the purposes of the statute are carried out, i.e., to ensure that all disabled children have access to a FAPE. Ibid. The Court concluded that this would not unduly burden school districts. Rather, it merely requires a school district to belatedly pay expenses that it should have paid all along and would have borne in the first instance had it developed a proper IEP. Id. at 359.

Reimbursement is still dependent upon the parents establishing that the unilateral placement provides the pupil with an appropriate education. Burlington, 471 U.S. at 359. They may be entitled to reimbursement for the costs of their unilateral private placement only if a court finds that the proposed IEP was inappropriate and that the private placement was appropriate under the IDEA. 20 U.S.C. § 1412(a)(10)(C)(ii);

N.J.A.C. 6A:14-2.10(b). Having determined that the District did not provide I.K. with a FAPE for the 2023−2024 school year, I must now determine whether the Aaron School placement was appropriate.

Our courts have held that "when a public school system has defaulted on its obligations under the [IDEA], a private school placement is 'proper under the [IDEA]' if the education provided by the private school is 'reasonably calculated to enable the child to receive educational benefits.'" Florence Cty. Sch. Dist. v. Carter, 510 U.S. 7, 11 (1993) (quoting Carter v. Florence Cnty. Sch. Dist. Four, 950 F.2d 156, 163 (4th Cir. 1991). Since the Florence decision, the Supreme Court in Endrew F. has redefined FAPE. The placement made by petitioners is proper if it was "reasonably calculated to enable [J.P.] to make progress appropriate in light of [his] circumstances." Endrew F., 137 S. Ct. 988 at 1001.

The placement of I.K. at the Aaron School originated when petitioners expressed concern about I.K. attending the Banyan School at the May 19, 2022, IEP meeting. Following the May 2022 IEP meeting, the District's case manager sent release of records forms to petitioners for three schools, proposed that petitioners look at Banyan's high school program, and requested that petitioners provide the District with any additional information as to other programs/schools that they were considering. On May 21, 2022, in response to the District's requests, petitioners proposed that the District send records to the Aaron School. The District did not respond to this request.

Thereafter, the District sent records to Winston Preparatory High School, The Craig School, The Community School, and Honor Ridge Academy. On May 23, 2022, Craig School advised respondent that they were not a match for I.K., as communication-impaired is not a classification they could support, ((P-4). On June 7, 2022, Winston Preparatory High School advised the District that it was "unable to meet [I.K.]'s academic, pragmatic and social-emotional needs." (P-6.)

Petitioners then attended intakes at Community School, Banyan Upper School, and Honor Ridge Academy. Petitioners subsequently requested from the District a copy of the records that the District had sent to Community School, Honor Ridge and Craig,

and the District did not respond. In July 2022, petitioners requested that the District consider Aaron as a potential placement. Petitioners requested that the District attend the Aaron intake with them, but the District denied their request. Petitioners made several inquiries to respondent during the summer of 2022 regarding I.K.'s high school placement, to no avail.

On July 25, 2022, I.K. was accepted at the Aaron School, and on said date, petitioners, through counsel, requested that the District place I.K. at Aaron. On August 10, 2022, with no other acceptance available or option available for the start of school in September, petitioners, through counsel, issued a unilateral placement notice. The District did not respond to the unilateral placement notice or hold an IEP or resolution meeting. On August 26, 2022, a month after petitioners' request to place I.K. at Aaron, twelve business days after issuing their unilateral placement notice, and days before school started, petitioners signed Aaron's contract.

Aaron "is a private K through 12 special education school" accredited by the Middle States Association of Colleges and by the National Independent Private Schools Association. Aaron serves students with developmental learning disorders, social challenges, learning disabilities in the areas of reading, writing, and math, and sensory and attention challenges. At Aaron, I.K. receives intensive language instruction, social skills classes and strategies, individualized/slower-paced instruction in his academic subjects, group counseling, and executive function courses.

The record reflects that Aaron utilizes an individualized case study team meeting, which helped to resolve I.K.'s rigidity in biology class, by using the school's social thinking program to adhere to the group plan, as well as putting the agenda on the board for the class. I.K.'s team at Aaron also developed a plan to address I.K.'s test-taking anxiety by emailing petitioners a week in advance of the test with study materials so they can work with I.K. at home. This strategy in particular helped I.K. feel prepared, thereby reducing his stress. Additionally, the case study meetings have been used to address I.K.'s social difficulties, such as processing social cues and integrating himself into a peer group.

The record reflects that since I.K. entered Aaron in ninth grade, he was a quiet and closed-off student who cried often, spent a lot of time with his counselor, and wore headphones to minimize negative feelings. Since enrolling at Aaron, I.K. is a very different student, as he doesn't cry, he no longer wears headphones, and he seems happier and more confident. Most importantly, as the record reflects, since attending Aaron, I.K. has made significant progress as a result of all the strategies and support provided via team meetings, case study meetings, counseling, integrated speech and language therapy, and his individualized course schedule. Aaron's program has helped I.K. manage his anxiety during his sessions. Aaron has also assisted in implementing I.K.'s social skills goals to assist him with organizing information in peer conversations.

In the hearing, petitioners reported that tenth grade has been "amazing" for I.K. as he continues to have academic success, advocates for himself, and is learning problem-solving skills. (4Tr. 42:7−18.) Petitioners stated that I.K. is more independent and able to navigate public transportation from home using the bus, subway, and walking. I.K. achieved all A's on his first-semester tenth-grade report card. Moreover, Dr. Tighe's expert opinion is that Aaron is appropriate for I.K. and "offers [I.K.] meaningful educational benefit." (P-29 at 167.) Additionally, Aaron is the least restrictive option for I.K. (5Tr. 68:20−21.) Based on her familiarity and evaluation of I.K. over several years, as well as her thorough observations of respondent's proposed program and Aaron's program, Dr. Tighe concluded the following: "In light of all of these findings, it is my strong conclusion that Teaneck Public School did not offer [I.K.] an appropriate educational program for ninth grade and the family selected a program for unilateral placement, Aaron School, that does meet that standard in light of [I.K.]'s individual circumstances." (P-29 at 168.)

I.K. has progressed in his education and done well at Aaron. Although Aaron is not a state approved school for students with disabilities, our courts have held that "parents [are] entitled to reimbursement even [when a] school lacks State approval because the [FAPE] State standards requirement[s] . . . [apply] only to placements made by a public authority." <u>L.M. ex rel. H.M. v. Evesham Twp. Bd. of Educ.</u>, 256 F. Supp. 2d 290, 297 (D.N.J. 2003) (citing <u>T.R. v. Kingwood Twp. Bd. of Educ.</u>, 205 F.3d 572, 581 (3d Cir. 2000)); <u>see also</u> <u>Warren G. v. Cumberland Cty. Sch. Dist.</u>, 190 F.3d 80, 83 (3d Cir. 1999); 34 C.F.R. § 300.148(c) (2019); N.J.A.C. 6A:14-2.10.

Based upon the foregoing, I **CONCLUDE** that I.K.'s placement at Aaron was appropriate and reasonably calculated to enable I.K. to receive educational benefits in light of his circumstances.

Having concluded that the District denied FAPE to I.K. and that the placement at Aaron School was appropriate, I am authorized to "grant such relief as [I determine] is appropriate." 20 U.S.C. § 1415(i)(2)(C)(iii). Our courts have held that "equitable considerations are relevant in fashioning relief under the IDEA." Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. 359 (1985). A court may reduce or deny reimbursement costs based on the parents' unreasonable behavior during the IEP process. 20 U.S.C. § 1412(a)(10)(C)(iii). New Jersey rules likewise confirm that the cost of reimbursement may be reduced or denied "[u]pon a judicial finding of unreasonableness with respect to actions taken by the parents." N.J.A.C. 6A:14-2.10(c)(4). The rules specifically require that parents advise the district at the "most recent IEP meeting" that they are rejecting the IEP and give at least ten business days' notice of their concerns or their intent to enroll their child in a nonpublic school. N.J.A.C. 6A:14-2.10(c)(1) and (2). The intent of the rule is to afford the district an opportunity to respond to the parents' concerns; work collaboratively with the parents to develop an IEP that delivers FAPE; and obviate the need for unilateral placement. The intent of the rule is to afford the parties one last opportunity to develop a plan for the student in the manner that the Federal law intended.

The District does not allege, nor is there anything in the record that petitioners acted unreasonably or failed to provide the District with an opportunity to respond to the parents' concerns and work collaboratively with the parents to develop an IEP that delivers FAPE to I.K. It is uncontroverted that at the May 2022 IEP meeting, the District presented a draft IEP placing I.K. at Banyan for the 2022−2023 school year. After petitioners communicated their dissatisfaction with Banyan, the District and petitioners agreed to change I.K.'s placement for high school.

The District offered potential placements. Petitioners agreed to consent to sending records to several placements. The District asked petitioners to provide the names of

other potential placements after the meeting. The next day, the District's case manager obtained petitioners' consent to send records to the agreed-upon programs. The District requested additional names from petitioners. Petitioners proposed Aaron. The District did not reply. Two programs, Craig School and Winston Prep, declined intakes. Petitioners and I.K. attended the offered intakes at Community School, Honor Ridge Academy and Banyan High School.

The District advised petitioners in late May and early June of the two rejections, but the District never produced an admission letter or email advising petitioners that any of the proposed schools accepted I.K. for the 2022–2023 school year. The District did not provide petitioners with prior written notice of its intent to place I.K. in any program for the 2022−2023 school year.

At the beginning of August 2022, petitioners did not have an IEP for the 2022–2023 school year or an acceptance from any of the schools to which the District sent records or to which the District and petitioners attended intakes. The only acceptance that petitioners had was from Aaron. Petitioners, through counsel, issued a unilateral placement notice on August 10, 2022. The District did not respond to the unilateral placement notice, and on August 26, 2022, a month after petitioners' request to place I.K. at Aaron, twelve business days after issuing their unilateral placement notice, and days before school started, petitioners signed Aaron's contract.

Based on the foregoing, I **CONCLUDE** that the parents did not engage in any unreasonable conduct that would warrant a reduction in the reimbursement of the costs of tuition for the Aaron School and reimbursement for transportation.

## ORDER

Given my findings of fact and conclusions of law as stated herein, it is **ORDERED** that the District reimburse petitioners for their expenses in unilaterally placing I.K. at the Aaron School, including transportation, for the 2022−2023 school year.

This decision is final pursuant to 20 U.S.C. § 1415(i)(1)(A) and 34 C.F.R. § 300.514 (2018) and is appealable by filing a complaint and bringing a civil action either in the Law Division of the Superior Court of New Jersey or in a District Court of the United States. 20 U.S.C. § 1415(i)(2); 34 C.F.R. § 300.516 (2018). If the parent or adult student feels that this decision is not being fully implemented with respect to program or services, this concern should be communicated in writing to the Director, Office of Special Education.

| | |
|---|---|
| July 7, 2026 | *Julio Morejon* |
| DATE | **JULIO C. MOREJON,** ALJ |
| Date Received at Agency: | July 7, 2026 |
| Date Sent to Parties: | July 7, 2026 |

lr

## APPENDIX

## Witnesses

For petitioners:

Jeanne Tighe, SLPD, CCC-SLP, SL/DI, BSC-CL

Tieasha Crawford, M.S.Ed., educational supervisor of the Upper School of Aaron School.

Petitioners, S.K. and D.K.

For respondent:

Vanessa Lospalluto

Leanna Barbosa, speech and language specialist

Dr. Kristine Thielman, school psychologist

Janet Seabold, principal, Banyan School

## Exhibits

Joint Exhibits:

| Joint Ex. No. | Document Name | Bates Stamp # | Document Date |
|---|---|---|---|
| J-1 | Neuro-Developmental Assessment prepared by Dr. Katlyne Lubin, dated 2/9/2018 | J-001−005 | 2/9/18 |
| J-2 | District's Speech & Language Evaluation prepared by Laura Dispoto, M.S., CCC-SLP, dated 2/13/2018 | J-006−012 | 2/13/18 |
| J-3 | District's Educational Re-Evaluation prepared by Robin Oliff, LDT-C, dated 2/14/2018 | J-013−027 | 2/14/18 |
| J-4 | District's Psychological Evaluation prepared by N. Lawrence, Psy. D, dated 3/1/2018 | J-028−032 | 3/1/18 |

| | | | |
|---|---|---|---|
| J-5 | District's Occupational Therapy Evaluation prepared by R. McMahon, MS, OTR/L, dated 7/19/18 | J-033−037 | 7/19/18 |
| J-6 | District's Auditory Processing Evaluation prepared by Lisa R. Nostrand, Au. D., CCC-A, dated 9/7/2018 | J-038−042 | 9/7/18 |
| J-7 | District's Request to Amend an IEP without a meeting, dated 1/24/19 | J-043−046 | 1/24/19 |
| J-8 | District's IEP from 3/15/19 meeting | J-047−086 | 3/15/19 |
| J-9 | Banyan's IEP Goals and Objectives Progress Report–Gr. 6 | J-087−094 | 11/15/19 |
| J-10 | Banyan's 6th Gr. Marking Period 1 Report Card | J-095 | 11/15/19 |
| J-11 | District's IEP from 3/3/20 meeting | J-096−130 | 3/3/20 |
| J-12 | Banyan's 7th Gr. Marking Period 4 Report Card | J-131 | 6/16/21 |
| J-13 | Banyan's IEP Goals and Objectives Progress Report–Gr. 7 | J-132−138 | 11/30/20 |
| J-14 | District's Educational Assessment Report–prepared by Dr. Judith Johnston, dated 5/4/2021 | J-139−146 | 5/4/21 |
| J-15 | Banyan's IEP Goals and Objectives Progress Report–Gr. 7 | J-147−150 | 5/4/21 |
| J-16 | District's Psychological Evaluation–prepared by Joseph J. Cafaro, MA/NCSP, dated 5/28/2021 | J-151−163 | 5/7/21 |
| J-17 | District's Speech & Language Evaluation–prepared by Laura Dispoto, M.S., CCC-SLP, dated 5/27/2021 | J-164−170 | 5/27/21 |
| J-18 | District's IEP from 6/4/21 meeting | J-171−208 | 6/4/21 |
| J-19 | Banyan's 8th Gr. Marking Period 4 Report Card 2021−2022 | J-209 | 11/12/21 |
| J-20 | District's IEP from 5/19/22 meeting | J-210−261 | 5/19/22 |

| | | | |
|---|---|---|---|
| J-21 | District's Release of Records for Community School and Craig School, executed on 5/20/22 | J-262−263 | 5/19/22 |
| J-22 | Banyan's School Grade 8 IEP Goals and Objectives Progress Reporting, dated 9/22/22 | J-264−270 | 9/22/22 |
| J-23 | WRMT-III Interpretive Report, dated 1/25/19 | J-271−279 | 1/25/19 |
| J-24 | WRMT-III Interpretive Report, dated 11/19/19 | J-280−287 | 11/19/19 |
| J-25 | WRMT-III Interpretive Report, dated 11/18/20 | J-288−295 | 11/18/20 |
| J-26 | District's IEP from 3/8/21 meeting | J-296−314 | 3/8/21 |

For petitioners:

| Joint Ex. No. | Document Name | Bates Stamp # | Document Date |
|---|---|---|---|
| P-1 | Beyond Communications' Comprehensive Language Evaluation prepared by Dr. Jeanne Tighe, dated 11/12/18 | P-001−039 | 11/12/18 |
| P-2 | Email from District to D.K. and S.K., sending records releases | P-040−044 | 5/19/22 |
| P-3 | Email from K. Edler to D. Pantaleo enclosing signed releases and requesting consent to send records to Aaron School | P-045–050 | 5/21/22 |
| P-4 | Email exchanges with District regarding Craig denial | P-051−056 | 5/23/22 |
| P-5 | Email re: Banyan and Community School tour dates | P-057−065 | 6/7/22 |
| P-6 | Email from S. Beckford to D.K. and S.K. re: Winston Prep School | P-066−072 | 6/7/22 |
| P-7 | Email from D.K. to S. Beckford confirming attendance for Banyan tour | P-073−085 | 6/8/22 |
| P-8 | Email from S. Beckford to D.K. and S.K. re: Honor Ridge Academy tour | P-086−087 | 6/10/22 |

| | | | |
|---|---|---|---|
| P-9 | Email from D.K. to S. Beckford requesting records be sent to Aaron School | P-088−098 | 6/21/22 |
| P-10 | Email from D.K. to S. Beckford requesting records be sent to Aaron School | P-099−105 | 7/10/22 |
| P-11 | Email from L. Gardner to D.K. and S.K. re: acceptance at Aaron School | P-106−107 | 7/25/22 |
| P-12 | Email from K. Edler to D. Pantaleo re: acceptance at Aaron School | P-108−110 | 7/25/22 |
| P-13 | Unilateral Placement Notice, dated 8/10/22 | P-111−113 | 8/10/22 |
| P-14 | Aaron School Related Services/Transition Dept. Course Guide 2022−2023 | P-114−116 | 2022−2023 |
| P-15 | Aaron School Tuition and Fees | P-117 | 2022−2023 |
| P-16 | Aaron School 2022−2023 Enrollment Contract | P-118−121 | 2022−2023 |
| P-17 | Printout from Aaron School Website regarding “Related Services” | P-122 | Not dated |
| P-18 | Printout from Aaron School Website regarding “Program Hallmarks” | P-123 | Not dated |
| P-19 | Printout from Aaron School Website regarding “About Us” | P-124 | Not dated |
| P-20 | Printout from Aaron School Website regarding “Curriculum” | P-125 | Not dated |
| P-21 | David Spielman Driving Invoice | P-126 | 9/8/2022−6/15/2023 |
| P-22 | Aaron School’s 1st Semester Report Card Narrative–Gr. 9 | P-127−130 | 9/8/22−6/30/23 |
| P-23 | Aaron School’s 9th Gr. 1st Q Progress Report, dated 11/10/22 | P-131 | 11/10/22 |
| P-24 | Aaron School’s Acceptance Letter with Re-Enrollment Contract and Payment Schedule attached | P-132−136 | 2/16/23 |

| | | | |
|---|---|---|---|
| P-25 | Aaron School's 2022−2023 Report Card 1st Semester–Gr. 9 | P−137 | Not dated |
| P-26 | Aaron School's 2022−2023 2nd Semester Report Card Narrative–Gr. 9 | P-138−142 | 1/31/23−6/15/23 |
| P-27 | Aaron School's 9th Grade 3rd Q Progress Report, dated 4/3/23 | P-143 | 4/3/23 |
| P-28 | Aaron School's 2022−2023 Report Card 2nd Semester/Final–Gr. 9 | P-144 | Not dated |
| P-29 | Petitioners' Expert Report from Dr. Jeanne Tighe-Beyond Communications Comprehensive Oral and Written Language Re-Evaluation | P-145−168 | May 2023 |
| P-30 | Unilateral Placement Notice, dated 8/4/23 (submitted unsigned) | P-169 | 8/4/23 |
| P-31 | Aaron School's 2023−2024 1st Semester Report Card−Gr. 10 | P-170 | 9/7/23−1/26/24 |
| P-32 | Aaron School's 1st Semester Report Card Narrative–Gr. 10 | P-171−175 | 9/7/23−1/26/24 |
| P-33 | Aaron School's 1st Q Progress Report, dated 11/3/23 | P-176 | 11/3/23 |
| P-34 | Aaron School Grade 9 Class Schedule Semester 1 | P-177 | 2022−2023 |
| P-35 | Advance Syllabus | P-178−179 | Not dated |
| P-36 | Biology Course Syllabus | P-180−181 | Not dated |
| P-37 | Visual Arts Global Perspectives Syllabus | P-182 | 2022−2023 |
| P-38 | Writer's Composition 1/Public Speaking Syllabus | P-183−185 | Not dated |
| P-39 | Global History I Syllabus | P-186−188 | 2022−2023 |
| P-40 | Responsibilities & Choices I Syllabus – Gr. 9 2022−2023 | P-189 | 2022−2023 |
| P-41 | Progress Charts | P-190–195 | 2018−2021 |

| | | | |
|---|---|---|---|
| P-42 | Intentionally Deleted | Not Stamped | |
| P-43 | Intentionally Deleted | P-196−206 | |
| P-44 | 2023 Spreadsheet of E-ZPass charges (Tag #810404567) | P-207−210 | 9/7/23−12/15/23 |
| P-45 | 2023 Spreadsheet of E-ZPass charges (Tag #810404566) | P-211−212 | 9/7/23−12/14/23 |
| P-46 | E-ZPass Statements for 2023 (Tag #810404566) | P-213−215 | 9/7/23−12/14/23 |
| P-47 | E-ZPass Statements for 2023 (Tag #810404567) | P-216−219 | 9/7/23−12/15/23 |
| P-48 | 2023 Spreadsheet of Mileage, Tolls and Parking | P-220−222 | 9/7/23−12/29/23 |
| P-49 | Spreadsheet of 2023 Uber Expenses | P-223−224 | 9/9/23−12/14/23 |
| P-50 | Spreadsheet of 2024 Uber Expenses | P-225 | 1/3/24−3/23/24 |
| P-51 | Credit Card Statements for Uber Expenses | P-226−252 | 10/31/23−2/28/24 |
| P-52 | 2024 Spreadsheet of Mileage, Tolls and Parking | P-253−254 | 1/2/24−3/13/24 |
| P-53 | 2024 Spreadsheet of E-ZPass charges (Tag #810404567) | P-255−256 | 1/3/24−3/12/24 |
| P-54 | 2024 Spreadsheet of E-ZPass charges (Tag #810404566) | P-257−258 | 1/2/24−3/10/24 |
| P-55 | E-ZPass Statements for 2024 (Tag #810404566) | P-259−261 | 1/2/24−3/10/24 |
| P-56 | E-ZPass Statements for 2024 (Tag #810404567) | P-262−263 | 1/3/24−3/12/24 |
| P-57 | Unilateral Placement Notice, dated 4/10/24 | P-264 | 4/10/24 |
| P-58 | Tieasha Crawford Affidavit, Educational Supervisor, Aaron Upper School | P-265−277 | 4/2024 |
| P-59 | Dr. Jeanne Tighe Resume | P-278−282 | 6/2023 |

| | | | |
|---|---|---|---|
| P-60 | E-ZPass Statements 2022–2023 (inadvertently previously labeled 2023−2024) for driver, David Spielman (Tag #813449676) | P-283−295 | 9/8/22−12/15/22; 1/3/2–6/15/23 |
| P-61 | T. Crawford Resume | P-296–297 | Not dated |
| P-62 | 9th Grade 2022−2023 Transportation Costs | P-298−313 | 2022−2023 |
| P-63 | 10th Grade 2023−2024 Transportation Costs through 3/22/24 | P-314−417 | 2023−2024 |

For respondent:

| District Exhibit # | Document Name | Bate Stamp# |
|---|---|---|
| R-1 | Resume of Maura T. Tuite, Ph.D. | R0001−R0002 |
| R-2 | Resume of Vanessa I. Lospalluto, L.D.T.C. | R0003−R0004 |
| R-3 | Resume of Kristine M. Thielman, Psy.D. | R000S−R0007 |
| R-4 | Resume and Certification of Leana Barbosa, S.L.P.D. | R0008−R0010 |
| R-5 | Resume of Yonit R. Malina, L.C.S.W., M.S.B.L. | R0011−R0012 |
| R-6 | Lospalluto Observation of Aaron | R0013−R0016 |
| R-7 | Barbosa Observation of Aaron | R0017−R0019 |

JS 44 (Rev. 08/18)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS**
S.K., D.K., and I.K.169

**(b)** County of Residence of First Listed Plaintiff: Bergen
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Karen F. Edler, Esq., Meese, Edwards, Breen, Conciatori & D'Arminio, P.C., 50 Tice Blvd., Woodcliff Lake, NJ 07677; 201-391-3737; eXT. 136

**DEFENDANTS**
Teaneck Township Board of Education

County of Residence of First Listed Defendant: Bergen
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*
Arsen Zartarian, Esq.,Cleary, Giacobbe, Alfieri, Jacobs, Lagana LLC, 169 Ramapo Valley Road, Upper Level 105, Oakland, NJ 07436

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question *(U.S. Government Not a Party)*
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* *(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)* Click here for: Nature of Suit Code Descriptions.

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**TORTS**

**PERSONAL INJURY**
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Personal Injury - Medical Malpractice

**PERSONAL INJURY**
- ☐ 365 Personal Injury - Product Liability
- ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
- ☐ 440 Other Civil Rights
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 448 Education

**PRISONER PETITIONS**
**Habeas Corpus:**
- ☐ 463 Alien Detainee
- ☐ 510 Motions to Vacate Sentence
- ☐ 530 General
- ☐ 535 Death Penalty

**Other:**
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition
- ☐ 560 Civil Detainee - Conditions of Confinement

**FORFEITURE/PENALTY**
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Management Relations
- ☐ 740 Railway Labor Act
- ☐ 751 Family and Medical Leave Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Employee Retirement Income Security Act

**IMMIGRATION**
- ☐ 462 Naturalization Application
- ☐ 465 Other Immigration Actions

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 835 Patent - Abbreviated New Drug Application
- ☐ 840 Trademark

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- ☐ 375 False Claims Act
- ☐ 376 Qui Tam (31 USC 3729(a))
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 485 Telephone Consumer Protection Act
- ☐ 490 Cable/Sat TV
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 893 Environmental Matters
- ☐ 895 Freedom of Information Act
- ☐ 896 Arbitration
- ☒ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- ☐ 950 Constitutionality of State Statutes

**V. ORIGIN** *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

**VI. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing ***(Do not cite jurisdictional statutes unless diversity)***:
20 U.S.C. 1400 et seq.
Brief description of cause:
Appeal of OAL decision of the Hon. Julio J. Morejon, ALJ

**VII. REQUESTED IN COMPLAINT:**
☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.
**DEMAND $**
CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☐ Yes ☒ No

**VIII. RELATED CASE(S) IF ANY** *(See instructions):*
JUDGE ______ DOCKET NUMBER ______

DATE
10/05/2026

SIGNATURE OF ATTORNEY OF RECORD
Karen F. Edler

**FOR OFFICE USE ONLY**

RECEIPT # ______ AMOUNT ______ APPLYING IFP ______ JUDGE ______ MAG. JUDGE ______

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)** **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)** **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)** **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked**.** (See Section III below**; NOTE: federal question actions take precedence over diversity cases.**)

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.** **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket. **PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.** **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service

**VII.** **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.